CITIZENS FOR A BETTER ENVIRONMENT, Dennis L. Adamczyk

v.

Anne GORSUCH, Administrator, U.S. Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

NATURAL RESOURCES DEFENSE COUNCIL, INC.,

v.

James I. AGEE, In his Official Capacity as Assistant Administrator for Water and Hazardous Materials Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

NATURAL RESOURCES DEFENSE COUNCIL, INC., a Non-Profit New York Corporation, et al.

v.

Anne M. GORSUCH, as Administrator, Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

ENVIRONMENTAL DEFENSE FUND, INC., a Non-Profit New York Corporation, et al.

v.

Anne M. GORSUCH, as Administrator, Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

NATURAL RESOURCES DEFENSE COUNCIL, INC. a Non-Profit New York Corporation, et al.

v.

Anne M. GORSUCH, as Administrator, Environmental Protection Agency

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

NATURAL RESOURCES DEFENSE

COUNCIL, INC.

v.

James I. AGEE, In his Official Capacity As Assistant Administrator for Water and Hazardous Materials Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

ENVIRONMENTAL DEFENSE FUND, INC., a Non-Profit New York Corporation, et al.

v.

Anne M. GORSUCH, as Administrator, Environmental Protection Agency

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

CITIZENS FOR A BETTER ENVIRONMENT, et al.

v.

Anne M. Gorsuch, Administrator, U.S. Environmental Protection Agency, et al.

Appeal of AMERICAN IRON AND STEEL INSTITUTE, et al.

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.

v.

Anne M. GORSUCH, Administrator, Environmental Protection Agency, et al.

Appeal of ALABAMA POWER COMPANY, et al.

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.

v.

James I. AGEE, In His Official Capacity as Assistant Administrator For Water and Hazardous Materials Environmental Protection Agency, et al.

Appeal of ALABAMA POWER COMPANY, et al.

CITIZENS FOR A BETTER ENVIRONMENT, et al.

v.

Anne M. GORSUCH, Administrator, Environmental Protection Agency, et al.

Appeal of ALABAMA POWER COMPANY, et al.

ENVIRONMENTAL DEFENSE FUND, INC., a Non-Profit New York Corporation, et al.

v.

Anne M. GORSUCH, Administrator, Environmental Protection Agency, et al.

Appeal of ALABAMA POWER COMPANY, et al.

Nos. 82–1365 to 83–1368, 82–1673 to 82–1676 and 82–1770 to 82–1773.

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1983.

Decided Oct. 4, 1983.

Charles F. Lettow, with whom Douglas E. Kliever, Michael A. Wiegard, Douglas E. McAllister, Richard E. Schwartz, Stark Ritchie, James K. Jackson, Arnold S. Block, Michael B. Barr and Scott Slaughter, Washington, D.C., were on brief, for appellants.

Barry S. Neuman, Atty., Dept. of Justice, with whom Peter R. Steenland, Jr., Nancy B. Firestone, Attys., Dept. of Justice, Michael Brown, Deputy Gen. Counsel, E.P.A., Bruce M. Diamond, Acting Associate Gen. Counsel, and Susan G. Lepow, Asst. Gen. Counsel, E.P.A., Washington, D.C., were on brief, for appellees, Anne M. Gorsuch, et al. Donald W. Stever, Atty., Dept. of Justice, Washington, D.C. also entered an appearance for appellees, Anne M. Gorsuch, et al.

Ronald J. Wilson, with whom J. Taylor Banks, Washington, D.C., was on brief, for appellees, Natural Resources Defense Council, Inc., et al.

William Scott Ferguson, Stamford Ct., entered an appearance for appellees, Olin Corp. in 82–1365 to 82–1368.

Before WILKEY and WALD, Circuit Judges, and BONSAL,* Senior District Judge for the Southern District of New York.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Senior District Judge BONSAL.

Dissenting opinion filed by Circuit Judge WILKEY.

BONSAL, Senior District Judge:

The intervenors in these consolidated cases, several corporations and trade associations (collectively "the Companies"),[1] appeal from orders of the United States District Court, Flannery, J., (1) denying their motion to vacate or, alternatively, to revise a settlement agreement ("the Agreement") previously approved by the district court, and (2) denying the cross-motion of the Environmental Protection Agency ("EPA" or "the Agency") and its Administrator to modify the Agreement due to changed circumstances. The issue presented by this appeal, as formulated in our earlier opinion, *Environmental Defense Fund, Inc. v. Costle,* 636 F.2d 1229, 1259 (D.C.Cir.1980),[2] is whether the "settlement agreement impermissibly infringes on the discretion Congress committed to the Administrator to make certain decisions under the [Clean Water Act]." For the reasons hereinafter stated, we hold that the Agreement does not impermissibly infringe on the Administrator's discretion and accordingly we affirm the orders of the district court.

BACKGROUND

The facts are set forth in some detail in our prior decision, 636 F.2d at 1234–38, familiarity with which is assumed. Briefly, the Agreement was entered into by the original parties[3] to these consolidated cases in settlement of the plaintiffs' claims that EPA had failed to carry out its statutory duty to implement certain provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1976), known in its amended form as the Clean Water Act ("CWA" or "the Act").[4] Following negotiations between the parties, the proposed settlement agreement was submitted to the district court, which held hearings and received comments from the intervenor Companies, which opposed it. The Agreement was authorized and executed for the government by both EPA and the Department of Justice. After making some changes in the agreement, on June 9, 1976 the court entered a "Final Order and Decree" ("the Decree") approving it as a "just, fair, and equitable resolution of the issues raised." *Natural Resources Defense Council, Inc. v. Train,* 8 Env't Rep.Cas. (BNA) 2120, 2122 (D.D.C.1976). No appeal was taken from the Decree. Therefore, the issue of whether, in a general sense, the district court acted properly in entering the June 9, 1976 Decree is not now before us.[5]

The Agreement contains a detailed program for developing regulations to deal with the discharge of toxic pollutants under the CWA. It required EPA to promulgate guidelines and limitations governing the discharge by 21 industries of 65 specified

---

1. These include the American Iron and Steel Institute, Union Carbide Corp., FMC Corp., Dow Chemical Co., Celanese Co., E.I. DuPont de Nemours & Co., Exxon Corp., Monsanto Corp., the American Petroleum Institute, the American Mining Congress, and numerous utility companies.

2. Other aspects of these cases were addressed in *Natural Resources Defense Council, Inc. v. Costle,* 561 F.2d 904 (D.C.Cir.1977).

3. The plaintiffs are the Natural Resources Defense Council, Inc., the Environmental Defense Fund, Inc., the National Audubon Society, Inc., Citizens for a Better Environment, Inc., and Business and Professional People for the Public Interest, Inc. (collectively "NRDC"). The defendants are William Ruckelshaus, Administrator of EPA, and the Agency itself.

4. The provisions involved are sections 301–304, 306, 307 and 402, codified at 33 U.S.C. §§ 1311–1314, 1316, 1317, and 1342.

5. Had the Companies appealed from the Decree, the scope of our review would have been narrow. "The district court's approval of a proposed settlement by consent decree should be reversed only if its approval is an abuse of the district court's discretion." *United States v. City of Miami, Florida,* 664 F.2d 435, 442 (5th Cir.1981) (*en banc*) (plurality opinion); *accord Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1015 (7th Cir.1980); *Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767, 771 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

pollutants. It also mandated the use of certain scientific methodologies and decision-making criteria by EPA in determining whether additional regulations should be issued and whether other pollutants should be included in the regulatory scheme. It did not specify the substantive result of any regulations EPA was to propose and only required EPA to initiate "regulatory action" for other pollutants identified through the research program. The regulations envisaged by the Agreement were, after full notice and comment, to be promulgated in phases by December 31, 1979 and the industries affected were to comply with them by June 30, 1983.

The district court explained in its Decree that the Companies would be free to influence the content of the proposed regulations by participating in the rulemaking proceedings and then could attack the legality of any final regulations in court. 8 Env't Rep.Cas. at 2121. The court also emphasized that EPA and NRDC had modified the Agreement to make clear that the court would not review EPA's "substantive judgments" under it. Id.

When EPA's implementation of the Agreement failed to meet the deadlines imposed therein, NRDC moved to have the Administrator held in contempt. Soon after, the Companies moved to vacate the Decree on the grounds that the 1977 Amendments to what became known as the CWA had superseded the Decree and rendered it moot, and that the Decree violated the Administrative Procedure Act's notice and comment provisions. EPA and NRDC then jointly moved for an order modifying the Decree in settlement of NRDC's contempt motion. On March 9, 1979 the district court modified the Decree according to EPA's and NRDC's request and denied the Companies' motion to vacate the Decree. *Natural Resources Defense Council, Inc. v. Costle*, 12 Env't Rep.Cas. (BNA) 1833 (D.D.C.1979). In general, the modifications granted EPA more time and flexibility to implement the requirements of the Decree in exchange for requiring EPA to provide NRDC more detailed information regarding implementation. Several of the Companies

appealed the district court's decision, which we affirmed. We found that Congress did not intend the 1977 Amendments to supersede the Decree, that the district court continued to have the power to enforce the Decree, and that the modifications in the Decree were not "rules" within the meaning of the APA for which EPA had to provide notice and comment. *Environmental Defense Fund, Inc. v. Costle, supra,* 636 F.2d at 1244, 1251, 1255–56. However, we remanded the case for the district court to consider whether the settlement agreement impermissibly infringes on the discretion Congress committed to the EPA Administrator to make certain decisions under the CWA. *Id.* at 1258–59.

On remand, the Companies filed a motion to vacate or, alternatively, to revise the Decree on the ground that it impermissibly infringed upon the Administrator's discretion under the CWA. EPA filed a cross-motion to modify the Decree in light of changed circumstances, seeking to extend certain deadlines and to delete from the Decree those provisions compelling the performance of "discretionary" actions by the Agency.

In a memorandum opinion filed February 5, 1982, the district court found that the Agreement "does not impermissibly infringe upon the discretion accorded to the EPA Administrator by Congress." *Natural Resources Defense Council, Inc. v. Gorsuch,* 16 Env't Rep.Cas. (BNA) 2084, 2090 (D.D.C. 1982). Accordingly, it entered an order on the same date denying the Companies' motion. The district court based its decision on five factors. First, it stressed the breadth of a district court's equitable power to give effect to remedial statutes. Second, it concluded that the Decree was "process" rather than "result" oriented. Third, it pointed out that the parties had participated extensively in formulating the Decree. Fourth, it noted that it had taken a flexible approach to fashioning the Decree, modifying it a number of times in response to objections raised by the parties. Finally, it found that Congress had the Decree in mind when it enacted the 1977 Amend-

ments to the CWA and "clearly approved of its procedures." *Id.* at 2087–89.

On May 7, 1982 the district court issued a second order, denying EPA's cross-motion and directing the Agency to submit proposed schedules for promulgating within one year all those regulations envisaged by the Agreement which had not yet been promulgated.[6] The Companies have appealed from the district court's first order and from that part of the second order which denied EPA's request to delete those portions of the Decree allegedly involving matters entrusted to the Administrator's discretion under the CWA. *EPA has not appealed the denial of that request.*

### DISCUSSION

*The February 5, 1982 Order*

The Companies' principal contentions on appeal are that: (1) the district court had no power to approve the provisions of the Agreement which direct EPA to take actions not required to remedy specific violations of the CWA; and (2) these provisions impermissibly infringe on the EPA Administrator's statutory discretion by precluding him from taking action otherwise open to him under the CWA.

### I.

Underlying both these contentions is the distinction drawn by the Companies between "statutory" and "nonstatutory" provisions in the Agreement. They maintain that certain provisions in the Agreement flow directly from specific requirements in the Act and hence are "statutory." As to the presence of these provisions in the Decree, the Companies raise no objection.[7] However, they assert that other provisions, which they refer to as "non-statutory," are not mandated by the Act and thus should have been excluded from the Decree by the district court. The Companies admit that the "non-statutory" provisions could have been included in the Agreement—but not in the Decree.

Amongst the so-called "non-statutory" provisions are ones which "impose criteria not prescribed in the statute for EPA's regulations." Br. for Appellants at 17. Here the Companies cite *inter alia* Paragraph 8 of the Decree, which sets forth criteria for EPA's decision to exclude "specific pollutants" or "point source categories" from proposed regulations.[8] Under the CWA, EPA is required to analyze various factors

---

**6.** On June 21, 1982 EPA moved pursuant to Fed.R.Civ.P. 60(b) for an order modifying the district court's May 7 order so as to give the Agency more time to promulgate the required regulations. On August 25, 1982 the district court issued an order indicating its willingness to grant EPA's motion if this court were to remand for that purpose, which it did on September 10, 1982. The district court then entered the order on October 26, 1982.

Following oral argument of this appeal, EPA and NRDC jointly moved for an order modifying paragraph 10(b) of the Decree. In an order dated June 10, 1983 the district court found the requested modification consistent with § 307(b) of the CWA, and on July 18, 1983 we remanded to the district court for entry of an order granting the joint motion.

**7.** The Companies identify only Paragraphs 7 and 13 as belonging in this category. In their view, these provisions impose deadlines on EPA for the promulgation of regulations explicitly required by the CWA, and therefore do not impermissibly restrict EPA's statutory discretion. Br. for Appellants at 16–17.

**8.**  8(a) Upon completion of the technology, economic, and public health and ecological

data gathering, including contracts, for a point source category listed in Appendix B and prior to publication of proposed regulations for such point source category, the Administrator may exclude from regulation under the effluent limitations and guidelines, standards of performance, and/or pretreatment standards contemplated by this Agreement for such category a specific pollutant for any of the following reasons, based upon information available to him:

(i) Equally or more stringent protection is already provided by an effluent, new source performance, or pretreatment standard or by an effluent limitation and guideline promulgated pursuant to Section(s) 301, 304, 306, 307(a), 307(b) or 307(c) of the Act.

(ii) Except for pretreatment standards, the specific pollutant is present in the effluent discharge solely as a result of its presence in intake waters taken from the same body of water into which it is discharged and, for pretreatment standards, the specific pollutant is present in the effluent which is introduced into treatment works (as defined in Section 212 of the Act) which are publicly owned solely as a result of its presence in the

in the course of developing toxic pollutant regulations. Section 307(a)(1) of the Act, 33 U.S.C. § 1317(a)(1), provides that:

> The Administrator in publishing any revised list [of toxic pollutants subject to regulation] shall take into account toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms, and the nature and extent of the effect of the toxic pollutant on such organisms.

The Companies contend that because the criteria specified in Paragraph 8 of the Decree are more extensive than those set out in section 307(a)(1) of the Act, the criteria should not be incorporated in the Decree.

Also alleged to be "non-statutory" are provisions which "create programs, not found in the statute, which EPA must now undertake." Br. for Appellants at 18. Here the Companies cite *inter alia* Paragraph 4(c) of the Decree, which requires EPA to "identify and study" additional pollutants (aside from the 65 listed ones) for which pretreatment standards *may* be necessary. Paragraph 4(c) describes in detail how EPA is to fulfill this requirement by implementing a study program to identify other pollutants for which EPA should initiate "regulatory action." [9] Paragraph 4(c)

point source's intake waters, *provided however,* that such point source may be subject to an appropriate effluent limitation for such pollutant pursuant to the requirements of Section 307; or

(iii) the specific pollutant is either not present in the discharge or in the effluent which is introduced into treatment works (as defined in Section 212 of the Act) which are publicly owned or is present only in trace amounts and is neither causing, nor likely to cause, toxic effects with respect to any identifiable organisms affected or likely to be affected by such discharge or effluent.

Such exclusions may also be made following proposal or promulgation of standards whenever information comes to the attention of the Administrator indicating that exclusion for any of the foregoing reasons is warranted.

(b) Upon completion of the technology, economic, and public health and ecological data gathering, including contracts, for a point source category listed in Appendix B and prior to publication of proposed regulations for such point source category, the Administrator may exclude from regulation under the pretreatment standards contemplated by this Agreement all point sources within a point source category or point source subcategory:

(i) if 95 percent or more of all point sources in the point source category or subcategory introduce into treatment works (as defined in Section 212 of the Act) which are publicly owned only pollutants which are susceptible to treatment by such treatment works and which do not interfere with, do not pass through, or are not otherwise incompatible with such treatment works, or

(ii) if

(A) the amount of pollutants introduced by such point sources into treatment works (as defined in Section 212 of the Act) which are

publicly owned which pollutants are not susceptible to treatment by such treatment works or interfere with, pass through, or are otherwise incompatible with such treatment works and

(B) the toxicity of such pollutants taken together is so insignificant as not to justify developing a pretreatment regulation in accordance with the schedules set out in paragraphs 7 and 13 of this Agreement.

(c) Whenever the Administrator decides to exclude a point source category or a specific pollutant from coverage pursuant to this section of this Agreement, he shall promptly serve upon the parties to the captioned cases, or their designated representative or attorney, a statement under oath designating the point source category or subcategory or specific pollutant to be excluded together with the reasons therefore. Such statement shall detail the reasons for the Administrator's exclusion, and shall set forth the data and information forming the basis for the exclusion. Proposed regulations for each point source category or subcategory shall identify each such exclusion, shall summarize the Administrator's statement, and shall invite public comments on such exclusion.

9. 4(c) The Administrator shall establish and implement a program to identify and study other pollutants which are introduced into such treatment works and which are not susceptible to treatment by such works or which interfere with, pass through, or are otherwise incompatible with such works. The program shall, at a minimum, address those pollutants listed in Appendix C identifiable by computer-based mass spectra search programs ("computer matching"), and shall consist of steps to: tentatively identify by computer matching pollutants discharged by point source categories listed in Appendix B; determine frequencies of occurrence and order-

appears to leave the scope, substance and particulars of "regulatory action" to EPA's discretion, as subject to the rulemaking process. Section 307(b) of the Act, 33 U.S.C. § 1317(b), which discusses pretreatment standards, states only that EPA must promulgate such standards "[n]ot later than ninety days after ... publication [of proposed regulations], and after opportunity for public hearing ...." The Companies complain that the program called for in Paragraph 4(c) "is [not] mentioned in, much less required by, the Act." Br. for Appellants at 19.

NRDC and EPA do not dispute that such provisions as Paragraphs 4(c) and 8 in the Decree are not mandated by the CWA. However, they contend that the programs and criteria specified in the Decree are consistent with the Act and do not bind the Agency to any particular substantive outcome. Instead, the programs and criteria establish analytic processes that EPA must employ in formulating proposed standards. NRDC and EPA both believe that there is a sufficient nexus between the Decree and the Act, even if every provision in the Decree is not derived from a particular requirement of the CWA.

## II.

■ The Companies' first contention, regarding the district court's power to approve the "non-statutory" provisions of the Decree, requires a brief discussion of the principles of law government consent decrees. In *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), the Supreme Court provided the following analysis:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

(Footnote omitted). Elsewhere the Supreme Court has stated that

> [c]onsent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court or administrative agency.

of-magnitude concentrations for the tentatively identified pollutants; analytically confirm the computer identification of those pollutants found with significant frequency in at least one subcategory and in high concentrations (the term "high" to be based on comparison with the concentrations of other pollutants found or known to be in the discharge and, where possible, on readily available information with respect to toxicity of the pollutants); determine for those pollutants analytically confirmed, based upon a comprehensive literature search of the latest scientific knowledge, the kind and extent of all identifiable effects on aquatic organisms and human health; develop from the above information a list of pollutants that are candidates for national regulation; determine, by molecular structure analysis and/or laboratory test data and/or field studies, or other appropriate means where practicable, both the probable compatibility of the listed pollutants with treatment works (as defined in Section 212 of the Act) which are publicly owned, and the probable extent to which industrial technology designed to remove pollutants included in Appendix A also will remove listed pollutants. The Administrator may remove pollutants from said pollutant candidate list that he deems to be compatible with publicly owned treatment works or effectively controlled by industrial technology upon which pretreatment standards promulgated pursuant to § 307(b) of the Act are based, or are present in only trace amounts and are neither causing nor likely to cause toxic effects. The Agency shall complete this program by July 1, 1983. Immediately thereafter, the Administrator shall undertake regulatory action for those pollutants remaining on the list.

United States v. ITT Continental Baking Co., 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975). While construction of a consent decree is essentially a matter of contract law, *see United States v. Armour & Co., supra; Sportmart, Inc. v. Wolverine World Wide, Inc.,* 601 F.2d 313, 316 (7th Cir.1979), the decree itself must be treated "as a judicial act." *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). Finally, a district court's "authority to adopt a consent decree comes only from the statute which the decree is intended to enforce." *System Federation No. 91, Railway Employees' Department, AFL–CIO v. Wright,* 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961).

The district court referred to the Agreement as a "classic settlement." 8 Env't Rep.Cas. (BNA) at 2122. The Agreement certainly follows the principles laid down in *United States v. Armour* and *United States v. ITT Continental Baking, supra.* By its terms, EPA achieved its objective of basing the regulation of toxic discharges on a technology-based, industry-by-industry approach instead of a health-based, pollutant-by-pollutant method. As we have previously noted, the technology-based approach "marked a change in EPA's regulatory strategy" and "offered substantial advantages over the old" one. *Environmental Defense Fund, Inc. v. Costle, supra,* 636 F.2d at 1235–36. In addition, as the district court stated, the Agreement represents a compromise for NRDC insofar as it accepted that EPA could regulate toxic pollutants under section 304 of the Act rather than under the health-based effluent standards called for by section 307, as NRDC's complaint had alleged. 8 Env't Rep.Cas. (BNA) at 2122. At the same time, NRDC also benefited from the Agreement, which bound EPA to promulgate regulations without specifying the exact substance of those regulations according to a fixed timetable for a specified list of pollutants.

Nevertheless, the Companies contend that, while EPA was free to dispose of this litigation by entering into the Agreement with NRDC, the district court had no au-

thority to enforce those parts of it which "go beyond statutory requirements." Br. for Appellants at 26. They assert that since, under *System Federation No. 91 v. Wright, supra,* the court's authority to approve the Agreement "comes only" from the CWA, each provision in the Agreement must be necessary to remedy a specific violation of the Act. In other words, the district court was permitted only to remedy those wrongs which it could specifically identify.

We think that this view of a court's power to adopt a consent decree is unduly narrow. The rule contended for by the Companies depends on an overly literal reading of *System Federation No. 91 v. Wright.* The statement that a district court's "authority to adopt a consent decree comes only from the statute which the decree is intended to enforce," 364 U.S. at 651, 81 S.Ct. at 373, means only that the focus of the court's attention in assessing the agreement should be the purposes which the statute is intended to serve, rather than the interests of each party to the settlement. Before approving the settlement in this case, the district court held hearings and solicited comments, and concluded that the Agreement was "a just, fair, and equitable resolution of the issues raised" in these cases, 8 Env't Rep.Cas. (BNA) at 2122, and that it was "consistent with Congress' intent that water pollution be curbed by 1983." *Id.* The fact that certain provisions in the Decree track the language of the Act more closely than others is irrelevant, so long as all are consistent with it. The Companies' suggested approach would require the court to undertake a close examination of each part of the Decree in order to establish that it was responsive to a specific violation of the Act. This would require, in turn, detailed findings that the Act had been violated in various ways.

However, the long-standing rule is that a district court has power to enter a consent decree without first determining that a statutory violation has occurred. *Swift & Co. v. United States,* 276 U.S. 311,

327, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928).[10] The court's duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits. As we have previously held, "prior to approving a consent decree a court must satisfy itself of the settlement's 'overall fairness to beneficiaries and consistency with the public interest'." *United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977), quoting *United States v. Allegheny-Ludlum Industries,* 517 F.2d 826, 850 (5th Cir.1975). In a more recent case, the Seventh Circuit has explained the nature of the inquiry to be undertaken by the district court:

> The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties.

*Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1014 (7th Cir.1980); *accord United States v. City of Miami, Florida,* 664 F.2d 435, 441 (5th Cir.1981) (*en banc*); *Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir.1981); *Patterson v. Newspaper & Mail Deliverers' Union of New York,* 514 F.2d 767, 771 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *United States v. Ketchikan Pulp Co.,* 430 F.Supp. 83, 86 (D.Alaska 1977); *see also Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998, 67 L.Ed.2d 59 (1981); Note, *The Consent Judgment as an Instrument of Compromise and Settlement,* 72 Harv.L. Rev. 1314, 1316 (1959).

■ Furthermore, it is precisely the desire to avoid a protracted examination of the parties' legal rights which underlies consent decrees. Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation. Thus, "[v]oluntary settlement of civil controversies is in high judicial favor." *Autera v. Robinson,* 419 F.2d 1197, 1199 (D.C.Cir. 1969).

In light of these settled principles governing judicial approval of settlement agreements, we see no merit to the distinction drawn by the Companies between "statutory" and "non-statutory" provisions of the Decree. The district court's findings that the Agreement was consistent with the purpose of the CWA and that it fairly resolved the controversy demonstrate that it conscientiously performed the duty of a court when asked to approve a settlement agreement. The focus of the court's inquiry throughout was the Act itself, as *System Federation No. 91* requires. As the court determined, and as EPA itself now urges, the Decree as a whole provides an effective means of carrying out EPA's obligations under the Act, and one that is acceptable to both sides in this dispute. It therefore was

---

**10.** As Justice Brandeis stated in *Swift*:

It is contended that the consent decree was without jurisdiction because it was entered without the support of facts. The argument is that jurisdiction under the Anti-Trust Acts cannot be conferred by consent; that jurisdiction can exist only if the transactions complained of are in fact violations of the Act; that merely to allege facts showing violation of the antitrust laws is not sufficient; that the facts must also be established according to the regular course of chancery procedure; that this requires either admission or proof; and that, here, there was no admission but, on the contrary, a denial of the allegations of the bill, and a recital in the decree that the defendants maintain the truth of their answers, assert their innocence, and consent to the entry of the decree without any finding of fact, only upon condition that their consent shall not constitute or be considered an admission. The argument ignores both the nature of the injunctions ... and the legal implications of a consent decree. The allegations of the bill not specifically denied may have afforded ample basis for a decree ... If the court erred in finding in these allegations a basis for ... an injunction, its error was of a character ordinarily remediable on appeal. Such an error is waived by the consent to the decree. Clearly it does not go to the power of the court to adjudicate between the parties.

276 U.S. at 327, 48 S.Ct. at 315 (citations omitted).

clearly within the district court's power to enter the Decree.

The Companies wanted the district court to do more than test whether the Decree complied with the purpose of the Act. The Companies in effect wanted the district court to circumscribe EPA's discretion to implement the CWA by stating that EPA could not enter into this Decree to settle a lawsuit attacking EPA's actions under the Act. If the court had done so, the practical effect would have been to limit EPA's discretion to move forward with its preferred CWA toxic regulation program, which the Decree promoted and protected. We believe the court's role should be more restrained.[11]

## III.

The Companies' second contention is that the Decree impermissibly infringes on EPA's discretion by dictating the approach to be taken by the Agency in promulgating regulations under the CWA. They claim that "the establishment of criteria and the development of programs within the confines of its regulatory obligations are fundamental aspects of the Agency's discretion under the Act. In the absence of the Decree, EPA could in the exercise of this discretion choose whether or not to establish the criteria and programs which the Decree mandates." Reply Br. for Appellants at 21.

The Companies rely heavily on the Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), as support for their argument. In particular, they cite the following passage as evidence that a court has no power to specify the procedures to be utilized by an agency: "The court should

... not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Id.* at 549, 98 S.Ct. at 1214. The Companies argue that both the Supreme Court and this court have repeatedly emphasized their intention to prohibit interference by the judiciary with procedural matters committed by statute to an agency's discretion. *See, e.g., Steadman v. SEC,* 450 U.S. 91, 104, 101 S.Ct. 999, 1009, 67 L.Ed.2d 69 (1981); *Chrysler Corp. v. Brown,* 441 U.S. 281, 312–13, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979); *Sierra Club v. Costle,* 657 F.2d 298, 391–92 (D.C.Cir.1981); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 711–12 (D.C.Cir.1975).

EPA and NRDC advance the same reasons for affirming the district court's decision that were relied on by the district court itself. Conceding that the decree infringes to some extent on EPA's discretion under the CWA, they contend that on the facts of this case the level of infringement is permissible. First, they assert that the Decree, far from prescribing any substantive outcome, merely sets forth procedures designed to remedy the Agency's prior allegedly unlawful actions. Second, they argue that EPA was a "prime formulator" of the Decree and that its judgment is entitled to great deference. Finally, they stress that Congress implicitly determined, by means of the 1977 Amendments to the Act, that the limits placed by the Decree on EPA's discretion were appropriate.

We begin by noting that the infringement of agency discretion issue normally arises in the context of a judicial order disposing of a case on its merits.[12] The

---

**11.** It would be especially unfortunate if a lack of judicial restraint stifled the evolution of less adversarial approaches to developing regulations. *See generally* Harter, *Negotiating Regulations: A Cure for Malaise,* 71 Geo.L.J. 1 (1982) (describing the costs and frequently unsatisfactory results of the formal rulemaking process and analyzing the possibilities for employing negotiations as a supplemental procedure); *see also* Note, *Rethinking Regulation:*

*Negotiation as an Alternative to Traditional Rulemaking,* 94 Harv.L.Rev. 1871 (1981).

**12.** However, in a recent case this Court identified the issue in a different context, that of a pretrial stipulation staying the proceedings. *National Audubon Society, Inc. v. Watt,* 678 F.2d 299, 301 (D.C.Cir.1981), a decision which features prominently in the appellants' brief, raised the question of "the power of the Execu-

issue is framed somewhat differently here because the Decree was entered by the district court *with EPA's consent.* It may well be, as the Companies argue, that "a court has a duty to determine that any consent judgment rendered is within the bounds of its judicial power, notwithstanding the parties' consent." Br. for Appellants at 40. Nevertheless, as the discussion in Part II above indicates, a court fulfills its responsibility in this respect simply by determining that the settlement is consistent with the statute the consent judgment is to enforce and fairly and reasonably resolves the controversy in a manner consistent with the public interest. Thus, the Companies' claim that a court does not have power to fashion consent decrees based upon its perception of the public interest misses the point. The Decree here was largely the work of EPA and the other parties to these suits, not the district court; manifestly, the requirements imposed by the Decree do not represent judicial intrusion into the Agency's affairs to the same extent they would if the Decree were "a creature of judicial cloth." *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 141, 102 S.Ct. 197, 200, 70 L.Ed.2d 298 (1981).

For this reason, the district court's decision to enter the Decree does not run afoul of the holding in *Vermont Yankee.* As we stated in *Association of National Advertisers v. FTC,* 617 F.2d 611, 619 n. 10 (D.C.Cir. 1979):

> The Court [in *Vermont Yankee*] held that absent extraordinary circumstances the federal courts cannot upset the products of agency rulemaking on the ground that the agency abused its discretion in failing to provide procedures that the courts rather than Congress or the agency believed necessary. Thus the case restricts the ability of courts to refashion normal rulemaking procedures with judi-

cially-conceived notions of administrative fair play.

In *Vermont Yankee* it was undisputed that the Nuclear Regulatory Commission had fully complied with the procedural requirements of the Administrative Procedure Act. The issue was whether a court could order that agency to afford more procedural rights to license applicants than the APA provided. Here, by contrast, EPA failed to comply with the statutory directive that the Agency promulgate various regulations. The ultimate issue raised by NRDC's suit, therefore, was what action EPA should be required to take in order to correct that deficiency. Since the solution arrived at was to a considerable extent the work of the Agency itself, and since the district court's role was confined to approving the fairness of the consent decree which incorporates it and ensuring the consistency of the Decree with the Act, *Vermont Yankee's* concern for "judicially-conceived notions of administrative fair play" is inapposite here.

None of the other cases cited by the Companies satisfy us that the Decree impermissibly infringes on the EPA Administrator's statutory discretion. First, none of them involve consent decrees. Second, they do not support the Companies' position in this case. For example, our statement in *Public Service Commission of New York v. Federal Power Commission,* 543 F.2d 757, 833 n. 42 (D.C.Cir.1974), that "a court may not compel an administrative agency to pursue a particular course of action when another is open to it" is quoted out of context by the Companies. As a reading of the rest of the opinion makes clear, "a particular course of action" refers to the agency's final decision on the merits of the question before it. *See Federal Power Commission v. Idaho Power Co.,* 344 U.S. 17, 20, 73 S.Ct. 85, 86, 97 L.Ed. 15 (1952) (holding that this Court had "usurped an administrative function" in deciding that a

tive Branch to restrict its exercise of discretion by contract with a private party." We noted there that the question was "novel and far-reaching" but chose not to address it, resting our decision on other grounds. *Id.* at 305 n. 12, 311. Since we interpreted the pretrial stipula-

tion to include an implied durational condition that had occurred, we found that the stipulation no longer bound the parties and it was "unnecessary for us to reach the broad and far reaching constitutional questions" in that case.

license should be issued by the FPC without the conditions attached to it by the agency). The Decree here does not prescribe the content of the regulations that EPA must promulgate. Nor does the Decree direct the Agency to enforce the regulations in any particular way.

In *National Association of Postal Supervisors v. United States Postal Service,* 602 F.2d 420 (D.C.Cir.1979), we held that the district court erred in ordering the Postal Service to maintain a specific salary differential of 25% between management personnel and rank-and-file workers, in light of the fact that the governing statute required only that the differential be "adequate and reasonable." The court's error lay in its failure to recognize the Postal Service's broad discretion over "internal management matters." *Id.* at 432. In *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692 (D.C.Cir.1975), another case involving the federal government's efforts to curb water pollution, we reversed in part a district court order requiring EPA to publish by a fixed date all effluent limitations guidelines mandated by the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1314(b)(1)(A). We held that the district court had erred in setting a deadline for publication of guidelines covering categories of "point sources" not listed in the statute, as Congress had clearly intended to leave such matters to the Agency's discretion. Here we are reviewing an order approving a settlement agreement that EPA voluntarily entered into, rather than an order requiring EPA to take action against its will. Hence our admonition in *Train* concerning the limits of a court's role in effectuating regulatory legislation [13] is not applicable. Indeed, in this case the

Companies want the court to narrow EPA's discretion to settle litigation in a manner that permits EPA to implement the CWA through EPA's preferred approach.

Our decision in *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (*en banc*) supports the district court's holding. In *Adams* we affirmed a district court order requiring the Secretary of Health, Education, and Welfare to take various steps to end segregation in public schools pursuant to Title VI. The plaintiffs' complaint alleged that HEW had adopted a general policy of seeking voluntary compliance with the statute which amounted to an abdication of its statutory duty. In its appeal, HEW contended that "although enforcement is required, the means of enforcement is a matter of absolute agency discretion ...." *Id.* at 1162. We rejected this argument and concluded that, in light of the unequivocal duty imposed on the agency by Title VI, the district court acted properly in directing it to pursue an affirmative enforcement policy. We think our observation in *Adams v. Richardson,* to which we recently referred in *Adams v. Bell,* 711 F.2d 161 at 164, 166 (D.C. Cir.1983) (*en banc*) is equally applicable to this case: "[O]ur purpose, and the purpose of the District Court order as we understand it, is not to resolve particular questions of compliance or noncompliance. It is, rather, to assure that the agency properly construes its statutory obligations, and that the policies it adopts and implements are consistent with those duties and not a negation of them." 480 F.2d at 1163–64 (footnotes omitted).[14]

Finally, we think that the argument, advanced by EPA and NRDC, that Congress implicitly sanctioned the limited infringe-

**13.** "Where there has been no violation of a statutory duty, we think the proper course is to confine ourselves to a declaration of the intent of Congress and to give the Administrator latitude to exercise his discretion in shaping the implementation of the Act." 510 F.2d at 711–12.

**14.** We also noted in *Adams v. Richardson* that "[f]ar from dictating the final result with regard to any of these [school] districts, the order merely requires initiation of a process which,

excepting contemptuous conduct, will then pass beyond the District Court's continuing control and supervision." 480 F.2d at 1163 n. 5, *quoted in Adams v. Bell,* 711 F.2d at 164–165 (D.C.Cir.1983) (en banc). The same may be said of the Decree in this case: it requires EPA to begin the process of formulating regulations in compliance with the Act and describes a methodology to be followed by the Agency, but it leaves the outcome of the process (the substantive regulations) to the Agency's discretion.

ment on the Agency's discretion which the Decree entails is well taken. As set out in our prior opinion, 636 F.2d at 1238–45, the legislative history of the 1977 Amendments contains numerous references to the Decree which suggest that "Congress expected the settlement agreement to continue in effect." *Id.* at 1244. We pause to emphasize just one of many: Senator Muskie, chairman of the Senate subcommittee that reviewed EPA's implementation of the Act and floor manager of the Conference Report in the Senate, explained to his colleagues that "[t]he conference agreement was specifically designed to codify the so-called 'Flannery decision,' [a consent decree that] ... EPA has been implementing." 123 Cong.Rec. 39, 181 (1977), *quoted in Environmental Defense Fund, Inc. v. Costle, supra,* 636 F.2d at 1243. Had Congress felt that the Decree infringed too much on the discretion it had given EPA's Administrator, that sentiment would likely have appeared in the legislative history. The Companies cannot identify any evidence of it, and all we have found is evidence to the contrary.

*The May 7, 1982 Order*

The Companies also appeal from part of the district court's order of May 7, 1982, denying EPA's cross-motion to modify the Decree in certain respects. EPA itself does not appeal from that decision. The Companies' arguments with respect to this order are similar to the ones they make with respect to the first order. In essence, they contend that the district court erred in declining to exclude from the Decree those provisions which the Companies deem "nonstatutory." For the reasons stated above in our review of the February 5 order, we find no error in the district court's order of May 7, 1982.

We note in passing that the Companies' concern that the district court has imposed a "high hurdle to modification of the Decree," Br. for Appellants at 56, appears misplaced. The district court's own assessment of the flexibility with which it has administered the Decree, 16 Env't Rep.Cas. (BNA) at 2089, is borne out by the record. For example, while this appeal was pending, the district court twice considered Rule 60(b) motions by EPA and NRDC to extend certain deadlines for the promulgation of regulations and for compliance by the Companies therewith, and in each case decided to grant the motion. *See* note 6 *supra.*

### CONCLUSION

The settlement agreement between EPA and NRDC does not impermissibly infringe on the EPA Administrator's discretion under the Clean Water Act. Therefore, the district court properly entered the Decree and its orders denying the motions to vacate, revise, or modify the Decree are *affirmed.*

WILKEY, Circuit Judge, dissenting:

This case comes before this court again on one issue: does the consent decree impermissibly restrict the discretion of the Administrator of the Environmental Protection Agency? I conclude that it does, and so would modify the decree to restore the agency's discretion.

### I. THE LIMITS IMPOSED ON THE ADMINISTRATOR'S DISCRETION

The consent decree at issue in this case is a judicial act.[1] It is not a contractual settlement agreement[2] or a tentative projection of agency policy. The court shaped it, scrutinizing and even altering its terms.[3] The court will be called upon to

---

1. *Pope v. United States,* 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944); *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

2. This court has already faced a case which raised similar issues in a contractual context. *See National Audubon Society, Inc. v. Watt,* 678 F.2d 299 (D.C.Cir.1982). Although the

court in that case recognized "potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private party," *id.* at 301, it resolved the case on other grounds.

3. The memorandum opinion of the lower court makes it perfectly clear that the court did not play merely a passive role in approving a con-

enforce it, should the agency have a change of heart.[4]

In undertaking this, or any other, judicial act, the court must heed the limits on the power of an Article III court.[5] The court's power to adopt a consent decree is limited by the terms of the statute it seeks to enforce.[6] The court cannot prescribe rules of procedure to an administrative agency,[7] nor may it enlarge upon the statute's substantive requirements.[8] In short, the court can only enter as a consent decree such relief as would have been within its jurisdictional power had the case gone to trial.[9]

The case law makes perfectly clear that one sort of judicial relief—commanding the Executive Branch to exercise its administrative discretion in a particular way—exceeds the reach of the federal court. Case after federal case has established that federal courts may not tell the Executive or Legislative Branches how to exercise their discretion.[10] As one court has explained the doctrine:

This self-imposed limitation on judicial power stems from the doctrine of separation of powers; courts cannot invade the jurisdiction of the other departments of government in matters of policy, and for a court to substitute its judgment or discretion for that of a member of the executive branch would amount to such an invasion.[11]

The consent decree at issue here cannot be reconciled with this principle. All parties agree on the dispositive issue: the decree does restrict the discretion of the Administrator of the EPA.[12] The consent decree constrains the agency in two basic ways. It requires the agency to apply criteria and standards not found in the Clean Water Act, and it requires the agency to undertake programs that are not required by the statute.

These constraints are not *de minimis*. This is obvious, of course, from the fact that the legitimacy of these restraints is worth litigating. They impose duties on the Administrator that differ in kind as

---

tract forged by other parties, but participated actively in shaping the decree. The court's substantial input into the decree came in part through its quasi-rulemaking in holding hearings on the proposed decree, and in part through its modifications of the decree proposed by the parties. *Natural Resources Defense Council, Inc. v. Gorsuch,* 16 Env't Rep. Cas. (BNA) 2084 (D.D.C.1982).

4. The value of the consent decree, of course, depends on the court's willingness to enforce it should the agency wish to adopt other procedures consistent with the act. The consent decree has no practical significance so long as the agency remains willing to follow voluntarily its provisions.

5. *System Federation No. 91 v. Wright,* 364 U.S. 642, 652–53, 81 S.Ct. 368, 373–374, 5 L.Ed.2d 349 (1961).

6. *Id.*

7. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

8. *National Association of Postal Supervisors v. United States Postal Service,* 602 F.2d 420 (D.C.Cir.1979).

9. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 469 F.Supp. 836,

855 (N.D.Ill.1979), *aff'd,* 616 F.2d 1006 (7th Cir.1980).

10. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (a reviewing court "cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"); *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331–34, 96 S.Ct. 579, 582–583, 584, 46 L.Ed.2d 533 (1976) (setting aside court order requiring the FPC to conduct an investigation); *FPC v. Idaho Power Co.,* 344 U.S. 17, 20, 73 S.Ct. 85, 86, 97 L.Ed. 15 (1952) (reversing court order which modified an FPC order granting a license); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940) (setting aside lower court order on priority in which FCC should consider license applications); *National Assoc. of Postal Supervisors v. United States Postal Service,* 602 F.2d 420 (D.C.Cir. 1979) (setting aside court ordered pay increase).

11. *Huntt v. Government of the Virgin Islands,* 382 F.2d 38, 45 (3rd Cir.1967).

12. Brief for Appellants at 16; Brief for Federal Appellees [hereinafter EPA Brief] at 23; Brief for Appellees NRDC [hereinafter NRDC Brief] at 24.

well as in scope from those duties imposed by the Act.

### A. *Paragraph 4(c)*

Paragraph 4(c) of the agreement, for example, requires the agency to "identify and study" additional pollutants to be subject to future pretreatment standards.[13] The decree specifies with great particularity the methods by which the Administrator must identify a list of pollutants that are "candidates for national regulation," the grounds upon which he may then remove pollutants from this list of "candidates," and then concludes by requiring the Administrator to "undertake regulatory action for those pollutants remaining on the list."

The Clean Water Act, by way of contrast, requires no such precisely delineated regulatory program. Section 307(b) of the Act requires only that the EPA promulgate standards for incompatible pollutants within a specified time period after the enactment of the Federal Water Pollution Control Amendments of 1972 and "from time to time thereafter."[14]

### B. *Paragraph 8*

Paragraph 8 of the decree similarly sets forth requirements and criteria for removing substances from the list of toxic pollutants.[15] The statutory provision[16] requires the EPA to take into account "toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the organisms in any waters, the importance of the affected organisms, and the nature and effect of the toxic pollutant on such organisms." So long as the Administrator does not act arbitrarily and capriciously, the court cannot vacate his decision. Even if his action is "arbitrary and capricious," the court's power is limited by statute to ordering a redetermination.[17]

Paragraph 8 of the consent decree sets forth a different set of criteria for the Administrator to follow. The court decree replaces the "considerations" set forth by the statute with specifically defined circumstances under which the Administrator may choose not to regulate specific pollutants. The Administrator must regulate the pollutants unless they fit within the alternative categories decreed by the court.[18]

### C. *Paragraph 12*

Paragraph 12 requires the EPA to establish "a specific and substantial program" to determine if "more stringent" effluent standards are necessary to protect water quality.[19] The decree defines the required program with precision: the Administrator must identify navigable waters which are seriously contaminated by toxic pollutants, identify toxic pollutants for which more stringent limitations may be necessary, and publish a strategy for reducing or eliminating discharges of such pollutants. No such program can be found anywhere in the Act.[20]

In at least these provisions, the judicial decree imposes duties on the Administrator which are not imposed by the Act itself. The decree thus differs not in degree but in kind from the decree the court might have issued if the case had been tried. At most, the court could have declared that the agency's actions were inconsistent with the statute; at most, the court could have required the agency to perform those functions mandated by the statute. In no circumstances could the court have obliged the agency to

---

13. Joint Appendix (JA) at 160.

14. 33 U.S.C. § 1317(b) (Supp. V 1981).

15. JA at 161–163.

16. 33 U.S.C. § 1317(a)(1) (Supp. V 1981).

17. *Id.*

18. JA at 161–163.

19. JA at 164–165.

20. The agency argues that this paragraph is meant to "integrate" Sections 302, 303 and 307(a) of the Clean Water Act. Brief for Federal Appellees at 23.

   However, none of these provisions contains any requirements for establishment of a program and publication of a strategy.

take discretionary action which differed from that required by the statute.

The duties imposed by the court's decree may not be inconsistent with the Act; each action taken by the Administrator under the decree might also conform with the Act. But the Administrator's discretion clearly is fettered—under the Act alone, he could choose to switch to another equally reasonable mode of compliance with the Act; under the consent decree he may not swerve from his judicially appointed course without risking contempt of court charges.

## II. THE "PERMISSIBILITY" OF LIMITING THE ADMINISTRATOR'S DISCRETION

The court's decree clearly intruded upon the province of the executive. The court went far beyond merely determining whether the EPA has acted lawfully in implementing the Clean Water Act. It imposed a consent decree consisting in large part of provisions which are neither mandated by the Clean Water Act nor necessary to ensure that the EPA performs its statutory duties.

The trial court and the appellees argue that these constraints on the agency are somehow "permissible."[21] While some of the arguments advanced in this regard are frivolous,[22] others raise serious constitutional and prudential issues.[23]

### A. Process or Result

The majority argues that those cases forbidding courts to intrude upon an agency's discretion speak only to situations where the court would make "the agency's final decision on the merits of the question before it."[24] This claim has two flaws. First, it is not supported by the case law. The prior cases limiting a court's power to intrude upon an agency's discretion dealt with issues as far removed from "final determination on the merits" as the order in which applications should be considered by the agency,[25] and the agency's method of gathering evidence.[26]

More subtly, the argument overstates the distinction between "merits" and "procedural" determinations. Where, as here, the "process" oriented decree requires the creation of new programs the court's decree always will affect substantive agency actions. The consent decree commits the EPA Administrator to certain choices—choices as to priorities, choices as to methods, choices as to allocation of resources. Such choices are not free. By choosing to follow the course of action outlined in the consent decree, the EPA necessarily has incurred certain costs. Some of those costs relate to the balancing of conflicting goals—here, the EPA is committed to a certain level of environmental protection, even though that level of protection might ulti-

---

**21.** *Natural Resources Defense Council, Inc. v. Costle,* 12 Env't Rep.Cas. (BNA) 1833 (D.D.C.); EPA Brief at 32–39; NRDC Brief at 21–38. The majority finds that the decree does not "impermissibly infringe" on the Administrator's discretion, Majority Opinion at 1130, but fails to specify whether it holds that the decree does not infringe upon the Administrator's discretion at all—perhaps because he accepted it—or that the infringement was permissible.

**22.** The majority opinion, for example, is disingenuous at best when it suggests that refusing to enter a court decree would have infringed upon the agency's discretion. Majority Opinion at 1127. Nothing in the concept of "executive discretion" gives an agency a right to the issuance of a court decree upon demand.

**23.** The majority finds "well-taken" the argument that Congress has "implicitly sanctioned" the decree. Majority Opinion at 1129–1130. Our prior opinion in this case considered this

issue at length, and concluded only that the 1977 amendments to the Act did not supersede the decree. *Environmental Defense Fund, Inc. v. Costle,* 636 F.2d 1229 (D.C.Cir.1980). We are content to accept the silence of the Act on the validity of this decree for what it is—silence.

To the extent that the majority argues that Congress has implicitly approved all consent decrees of this type, it fails to avoid the underlying issue: whether either Congress or the courts can delegate executive functions to the judicial branch without violating separation of powers principles.

**24.** Majority Opinion at 1128.

**25.** *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

**26.** *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976).

mately generate uneconomic costs for the public. Still other costs relate to the EPA's allocation of its own resources. By committing some of its all-too-scarce resources to the programs mandated by the consent decree, the EPA necessarily foregoes developing or enforcing other priorities.

The court, by confining the Administrator's discretion, thus involves itself—subtly but nonetheless inevitably—in issues of agency policy. The EPA, in its unsuccessful bid to be released from the strictures of the decree, made much the same argument to an unsympathetic district court: "Extra obligations not required by statute necessarily infringe on EPA's ability to allocate its limited resources in the way it finds best." [27] As the Supreme Court's experience with the "outcome determinative" test in the context of applying *Erie Railroad Co. v. Tompkins* [28] goes to show, the line between those acts that decide the merits and those that do not is one the existence of which can be postulated, but not proved.

### B. The Administrator's Consent

A more superficially appealing argument claims that the agreement does not intrude upon the Administrator's discretion because he has agreed to its terms. [29] But, a decree of this type binds not only those present Administrators who may welcome it, but also their successors who may vehemently oppose it. For reasons that ultimately have to do with preserving the democratic nature of our Republic, American courts have never allowed an agency chief to bind his successor in the exercise of his discretion. [30] Today's majority decision effectively undercuts that line of authority by allowing an Administrator to waive his successor's power of discretion—so long as a court is willing to play accomplice.

### C. The Equitable Powers of the Federal Courts

The most profoundly troubling of the arguments for the consent decree holds that the court may, as an exercise of its equity powers, take virtually any remedial action it chooses. [31] Only a rough equity balancing of all the facts of the case would tell whether the court's order was a "permissible" extension of its equity jurisdiction. Here, the argument goes, the court's action was justified as a practical way to resolve vexatious litigation.

This argument fails here for two reasons. First, appellees err in contending that the equity power of the federal courts knows no bounds but necessity. [32] Appellees correctly note that in many cases federal courts have exercised broad remedial powers in correcting Constitutional violations. Courts have used their equitable powers to assume administrative and legislative roles, supervising in a highly active and intrusive manner

27. JA at 319.

28. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). For a general discussion of the waxing and waning of the "outcome determinative" test between *Guaranty Trust of New York v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) and *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), *see* C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4504 (1982).

29. Majority Opinion at 1127–1128.

30. *See Wilbur v. United States ex rel. Kadrie,* 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930) (agency position on whether certain children were entitled to interest payments from a statutorily created fund); *West v. Standard Oil Co.,* 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265 (1929) (agency determination as to whether land contained minerals). *See also National Audubon Society, Inc. v. Watt,* 678 F.2d 299, 305 n. 12 (D.C.Cir.1981) (Dictum: general principles as to whether a contract restricting executive discretion can be valid can be drawn from dictum in cases dealing with the constitutional prohibition on state laws impairing the obligation of contracts; from cases upholding one Administration's decision to change a policy adopted by its predecessors; from cases limiting the power of the judiciary, in the absence of any contract, to direct the executive in the exercise of its discretion; and from cases holding that particular contracts made by one Administration were binding on the next.)

31. NRDC Brief at 18–41.

32. *Id.* at 19.

prisons, school systems, mental hospitals and electoral apportionment.[33]

In those cases, however, the court invariably acts against state governments or individual citizens. Those decisions in which the court seizes the broadest powers are also those in which it declares that the doctrine of separation of powers does not apply "vertically" when courts act under the Supremacy Clause.[34] In the case at issue, the court acts against a coordinate and co-equal branch of government. The court cannot take refuge in the Supremacy Clause. The court must face head-on the separation of powers issue.

The court's infringement on the agency's discretion resolves that issue. The court here acts as an Administrator. It acts without any statutory or constitutional mandate; the contested provisions of the decree admittedly exceed what could be required by the statute. To permit the court's equity powers to extend so far would abolish the principle of separation of powers.

The argument also fails because even if the court's equity power might conceivably support the decree at issue, the court still should ask whether its exercise of power is prudent. In this case of first impression, that prudential inquiry must necessarily ask whether this new device for agency administration will prove wise over time. A look at this procedural innovation suffices to

show that government by consent decree is not only unconstitutional but unwise.

First, any legitimate purpose served by the decree could have been accomplished by other means. The agency did not need a consent decree in order to take the actions mandated by the decree. Since those actions were within its discretion it could have pursued a course of action precisely identical to that called for by the court order.

Nor did the agency need a consent decree to lend some stability to its position. The agency could have, by undertaking proper notice and comment rulemaking, issued the substance of the consent decree as regulations.[35] Such a course of action would give all parties affected by the proposed programs a chance to be heard, as well as bind the agency not to change course "arbitrarily and capriciously." [36]

The flaws with government by consent decree run deeper than the superfluity of the device. The device invites abuse—intentional or unintentional. Today's action may seem desirable to some because it requires a sometimes recalcitrant agency operating under a relatively precise statute to provide more of what many see as an unmitigated social good—environmental regulation. The device can just as easily be used, however, to establish regulatory "processes" which guarantee the bare minimum of regulation[37] or which enable regulated indus-

---

33. *See, e.g., James v. Wallace,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd in part, remanded in part sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160, *judgment reversed in part, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir.1966), *modified per curiam on rehearing en banc,* 380 F.2d 385 (5th Cir.1967), *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). *See generally, Fletcher, The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy,* 91 Yale L.J. 635 (1982); Diver, *The Judge as Political Powerbroker: Superintending Structural Change in Public Institutions,* 65 Va.L.Rev. 43 (1979).

34. *Elrod v. Burns,* 427 U.S. 347, 352, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976) ("[T]he separation-of-powers principle, like the political-question doctrine, has no applicability to the

federal judiciary's relationship to the States.") *See generally,* Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies,* 30 Stan.L.Rev. 661 (1978).

35. The agency could also have agreed to issue proposed regulations, with the litigation held in abeyance pending the issuance of the regulations.

36. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983).

37. According to the EPA itself, this decree allows the agency to defer certain statutorily required programs longer than they might have been able to do if the court had strictly enforced the statute. EPA Brief at 12–16. The imposition of programs not required by the

tries to evade prosecution. Nor is the device limited to the EPA. Under the typical broad and imprecise administrative statute, almost any agency action would pass the majority's vague test that the decree somehow be "consistent" with the law. An inattentive or unprincipled court could thus bind successive administrations to a nonstatutory, limiting "process" of regulatory action.

The abuses to which this device can be put are limited only by the almost inexhaustible imaginations of litigants. The same sorts of "procedural" agreements that the majority finds so innocuous could be used to limit the manner in which an agency goes about seeking evidence or to constrain the investigative practices of federal agencies. EPA and OSHA, for example, could consent not to conduct on site inspections without first rendering 60 days notice. Such a "procedural" agreement would be fully acceptable under the majority's approach; in practice, it would limit the effectiveness of the agencies.

The greatest evil of government by consent decree, however, comes from its potential to freeze the regulatory processes of representative democracy. At best, even with the most principled and fair-minded courts, the device adds friction.

First, the device makes far more difficult the task of those citizens who wish to monitor agency actions and influence their development. This court has previously ruled that the consent decree at issue here does not rise to the level of a rulemaking. That may or may not be good law. In any case, however, the consent decree binds the agency, and binds it in some ways even more than a rule would. An agency can abandon a rule so long as the change in policy is not arbitrary and capricious;[38] an agency cannot escape a consent decree without the active participation and approval of the court.

The commitment that occurs through a consent decree takes place, however, without recourse to the public notice requirements of notice and comment rulemaking. Those third parties who wish to know of such consent decrees would be faced with the nearly impossible task of monitoring all of the nation's district courts. Even then, if the filing of the suit and the consent decree coincide closely in time, notice would amount only to learning that the binding decree is a *fait accompli.*

Second, government by consent decree inhibits Congressional influence on agency policy. No longer could an agency freely and voluntarily respond to Congressional concerns; action would be impossible without prior approval of the court. The informal give-and-take between Congress and the agencies that characterizes modern administrative practice would be squeezed out by the court's assumption of control.

Third, Executive Branch control over agency policy would be hindered. So long as a consent decree remained in force, no new policy spurred by a change in administrations (or prompted by a desire to avoid a change in administrations) could take effect without the prior blessing of the court. Conversely, the consent decree provides the executive with a vehicle for avoiding responsibility for its programs.

This weakening of democratic control over agency policy accompanies an increase in the power of two nondemocratic groups. Government by consent decree enshrines at its very center those special interest groups who are party to the decree. They stand in a strong tactical position to oppose changing the decree, and so likely will enjoy material influence on proposed changes in agency policy.

Standing guard over the whole process is the court, the one branch of our government which is by design least responsive to democratic pressures and least fit to accommodate the many and varied interests af-

---

statute thus was a trade-off for not imposing tight deadlines for programs required by the statute.

**38.** *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983).

fected by the decree. The court can neither effectively negotiate with all the parties affected by the decree, nor ably balance the political and technological trade-offs involved. Even the best-intentioned and most vigilant court will prove institutionally incompetent to oversee an agency's discretionary actions.

As a policy device, then, government by consent decree serves no necessary end. It opens the door to unforeseeable mischief; it degrades the institutions of representative democracy and augments the power of special interest groups. It does all of this in a society that hardly needs new devices that emasculate representative democracy and strengthen the power of special interests.

I see no need and no warrant for countenancing this raid on the powers of the Executive Branch. I respectfully dissent.