**UNITED STATES of America, et al., Plaintiffs,**

and

**City of Whitehall, et al., Intervenor Plaintiffs,**

and

**City of Roosevelt Park, et al., Added Plaintiffs,**

v.

**The COUNTY OF MUSKEGON, Defendant,**

and

**S.D. Warren Company, et al., Intervenor Defendants.**

No. 1:97–CV–486.

United States District Court, W.D. Michigan, Southern Division.

Dec. 16, 1998.

W. Francesca Ferguson, Asst. U.S. Attorney, Michael H. Dettmer, U.S. Attorney, Grand Rapids, MI, Francis J. Biros, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington DC, Lois J. Schiffer, Environmental & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for U.S., plaintiff.

John C. Scherbarth, Asst. Atty. General, Jennifer M. Granholm, Atty. General, Natural Resources Div., Lansing, MI, for State of Michigan, plaintiff.

Robert S. Engel, Robert S. Engel Law Offices, Muskegon, MI, for City of Roosevelt Park, plaintiff.

James M. Rose, Rose & Rose, Montague, MI, for Whitehall Tp. and Montague Tp., plaintiffs.

Stephen C. Corwin, Williams, Hughes, Corwin & Sininger, LLP, Muskegon, MI, for County of Muskegon, defendant.

Michael B. Ortega, Reed, Stover & O'Connor, PC, Kalamazoo, MI, for City of Whitehall, City of North Muskegon, City of Montague, Muskegon Chartered Tp., Dalton Tp.,

City of Muskegon, Laketon Tp. and City of Norton Shores, intervenor-plaintiffs.

G. Thomas Johnson, Parmenter & O'Toole, Muskegon, MI, for Egelston Tp, intervenor-plaintiff.

Dennis J. Donohue, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for S.D. Warren Co., Burdick & Jackson Laboratories, ESCO, Howmet Corp., Lomas, Inc., Agrevo U.S.A. Co., Sun Chemical Corp., CWC Textron, Genesco, Inc., Dana Corp., Kaydon Custom Bearings and Lorin Industries, Inc., intervenor-defendants.

## OPINION RE MOTION FOR ENTRY OF CONSENT JUDGMENT AND MOTION TO LIMIT DISCOVERY

HILLMAN, Senior District Judge.

This case originally was brought by the United States against the County of Muskegon. The government's complaint alleges unlawful exceedances of the effluent limits of the county's permit issued by the Environmental Protection Agency ("EPA") under the Clean Water Act (the "NPDES permit"), as well as for failures to comply with EPA administrative orders. The county denied liability on the basis of its inability to comply both with the federal requirements of its permits and its contracts with various local governmental units and industrial users of the system.

Shortly after the action was filed, certain of the local governmental units with contracts with the county sought leave to intervene in the action and to file a three-count complaint against the county. Count I of the intervenor plaintiffs' complaint alleges violations of the county's NPDES permit for failure to enforce the Industrial Pretreatment Program, and violation of 40 C.F.R. § 401 et seq. for failure to operate the system in compliance with the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"). Count II alleges a number of violations of the grant provisions of the Clean Water Act, 33 U.S.C. § 1284(b) and the implementing regulations, 40 C.F.R.

§§ 35.2100–2350. Count III alleges contract and common law rights of access to the waste water treatment system on the part of the local units.

Thereafter, certain industrial users of the system filed a motion to intervene as party defendants. The court allowed intervention by both intervening plaintiff local units and intervening defendant companies. Intervening plaintiffs also moved to add the remaining local units who have contract rights under the system. That motion also was allowed.

This matter is now before the court on the joint motion of defendant County of Muskegon and the intervening and added plaintiffs (collectively, the "local units" or "intervening plaintiffs") for entry of a consent decree to resolve the complaint of the intervening plaintiff local units. The motion is strenuously opposed by intervening defendant industrial users.

Having reviewed the proposed consent judgment, motions and attachments filed by the parties, and having heard oral argument, I conclude that the joint motion of the county and local units should be granted and that the consent judgment should be entered.

## I. BACKGROUND

In 1970, defendant county and various local units entered into an intergovernmental "Access Rights Agreement" through which the parties established the Muskegon County Wastewater Management System ("MCWMS" or "the system"). (Movants' Ex. C.) In their agreement, the parties sought to construct a county-wide wastewater management system that would treat the sewerage of all of the local units. In exchange, the local units pledged their full faith and credit to repay certain bonds that would be issued for construction and operation of the system. Shortly thereafter, in 1973, service agreements were executed between the county and the various local units, as well as between the county and certain large corporate users, in order to repay the operational costs of the system.[1]

---

1. While none of the parties have been explicit about the number of intervening defendant companies with whom the county has individual contracts, all concede that at most six companies

The governmental bonds contemplated in the Access Rights Agreement and service agreements were issued in the amount of $16 million. In addition to this bond funding, the original construction of the system was financed by certain Clean Water Act grants, in the amount of approximately $24 million. The system was constructed and began operations in approximately 1975. An improvement to increase the capacity of the system was begun in 1989 and substantially completed in 1992. That improvement was financed by an additional $23 million in bonds payable by the local units and an additional $23 million in Clean Water Act grant monies.

Intervening plaintiff local units allege that by accepting federal and state grant monies under the Clean Water Act, the system became obligated to operate in compliance with its permit issued under the National Pollution Discharge Emissions Permit System ("NPDES permit"). Under federal rules, the county is obligated to have in place certain Industrial Pretreatment Programs ("IPP"). These IPP requirements are found in the Code of Federal Regulations and State Administrative Code, 40 C.F.R. 401 *et seq.* The intervening plaintiffs contend that the county has failed to comply with the IPP regulations. In addition, intervenors contend that the CWA grant regulations limit how grant assistance may be used for reserve capacity and require that the principal purpose of the project be treatment of domestic waste water. *See* 40 C.F.R. 35.2125. Intervening plaintiffs contend that, in light of state court interpretations of the agreement, the principal purpose of the system has been wrongfully converted to the treatment of industrial waste.

Each of the various service agreements, samples of which are included as exhibits by the parties, incorporated Exhibit D to the intergovernmental Access Rights Agreement between the county and the local units.

Each service agreement contains the following language:

Attached hereto as Exhibit D and by this reference made a part hereof are regulations which govern discharges to the System. In accordance with the procedures set forth therein, the County may amend or repeal any such regulations, or promulgate new regulations if reasonably required for the proper functioning of the System and/or to achieve equity among users thereof; and, provided, however, that any such regulations or amendments thereto shall not be more stringent than those required by state and federal agencies; and provided further, that if any such amendment, repeal or promulgation shall have the effect of barring from the System any portion of the Waste Materials of any contractee or party served by a Contractee, any guarantee of such Contractee or party shall be proportionately reduced.

Intervenor Defendants' Ex. D, ¶ 8.

Exhibit D to the Access Rights Agreement contained Uniform Concentration Limits ("UCLs") on the levels of all discharges from all users, but allowed the county director to exercise discretion to accept variations. *See* Movants' Ex. E. In addition, Section III–B to Exhibit D provides:

It is the intent and purpose of the System to provide the maximum possible service to each Contractee and person served by the System, consistent with the preservation of public health and safety, the fulfillment of obligations under state and federal law, the successful functioning of the System and fairness to all parties.

As noted, paragraph 8 of the service agreements and section X of Exhibit D authorized the county to develop new regulations. Exercising those provisions, in 1980, the county unilaterally amended the regulations in Ex-

have such agreements. Five such companies were cited in *S.D. Warren v. County of Muskegon,* No. 95–032651 CE: S.D. Warren (Scott Paper); Lomac, Inc.; AgrEvo USA Co.; Sun Chemical, Inc.; and Genesco, Inc. One additional company (Lorin Indus., Inc.) was considered by the Muskegon County Circuit Court to be a contracting party under the individual agreements based on a description in the service agreements of com-

panies of a certain size that were intended to be considered contracting companies and to be treated similarly to the actual signatories. Lorin, in other words, arguably may be considered a third-party beneficiary to the individual service agreements. *See* Movants' Ex. B, Pt. 2, P. 28. The remaining intervening companies have no such individual contracts.

hibit D to replace the UCL limitations and discretionary variations with a limitation based on an amount which "may cause or does cause interference" with the system.[2] *See* Movants' Ex. F: Amendments to Exhibit D (incorporating amendments of 1980, 1985, and 1992). The 1980 Amendments to Exhibit D continued the right in paragraph 8 of the service agreements for the county to further amend the Exhibit D regulations, consistent with the overall functioning of the system in conjunction with federal and state requirements. *See* Exhibit D to Service Agreements, and Amendments to Exhibit D.

In 1994, the county adopted an ordinance purporting to replace Exhibit D and the 1980 Amendments to Exhibit D in order to implement future restrictions upon discharges into the system. That ordinance placed discretion in the county, as operator of the system, to limit discharges. A group of industrial users filed suit against the county in Muskegon County Circuit Court, seeking to enjoin the county from implementing the ordinance, and contending that the companies had contract rights under the service agreements that were violated by the 1994 regulations. The Muskegon County Circuit Court held that the service agreements, including Exhibit D and Amendments to Exhibit D, constituted contracts, and that the industries had identical contract rights either under their individual contracts or as third-party beneficiaries of the municipal agreements. The court enjoined the county from enforcing the ordinance because that ordinance was unduly restrictive in light of the language in the original Exhibit D professing an intent to provide "maximum possible service" to each user in conjunction with the language of the Amendments to Exhibit D, limiting discharges to those that may or do cause interference. *See S.D. Warren v. County of Muskegon,* No. 95–032651 CE. The court held that

the industrial users had the right to maximum possible use of the system up to the level of interference, which the court defined as 100% of system capacity less a 10% safety factor. Both the county and local units interpreted the circuit court's decision to mean that any one user could utilize the entire capacity of the system, subject only to the 10% safety factor.

The circuit court decision was affirmed by the Michigan Court of Appeals in an unpublished decision issued in July 1998. *See* Intervening Defendants' Ex. I: *S.D. Warren v. County of Muskegon,* No. 197060 (July 14, 1998). The appeals court agreed with the circuit court that the county's discretion under the earlier contracts and amendments did not extend to the unilateral authority to replace the Amendments to Exhibit D with the ordinance. The court, however, declined to interpret the circuit court decision as holding that any one user had the right to exhaust all system capacity. Instead, the court held that the decision should be interpreted to mean that

> each user is entitled to reasonable access to available capacity. While it is true that the circuit court concluded that "[t]he plaintiffs have a contractual right to maximum possible use of the system," the court also recognized that all uses of the system "must be consistent with 'the preservation of public health and safety, the fulfillment of obligations under federal and state law, the successful functioning of the system, and fairness to all parties.'" As the circuit court correctly recognized, the choice is not between on the one hand the 1994 ordinance and, on the other hand, the total absence of any discharge limits (where a single user could effectively control the entire system). Rather, there is a middle ground that recognizes that the need for establishing specific discharge limits and a

---

**2.** "Interference" was defined in the agreements to mean:

> inhibition or disruption of the public sewer or the POTW [publicly owned treatment works] sewer system or the POTW's treatment processes or operation which causes or significantly contributes to a violation of any requirement of the POTW's NPDES permits. The term also includes prevention of sewage sludge use or disposal by the POTW in accordance

> with published promulgated [federal and state rules and] regulations.... Pollutants in the effluent of a User shall not be considered to cause Interference where the User is in compliance with the specific prohibitions, standards, effluent standards or effluent limitations developed by the Federal government, the State of Michigan, local government, the State of Michigan, local government or the POTW.

permit system can be met while at the same time protecting plaintiffs' unambiguous right to use the system's available capacity.

*S.D. Warren v. County of Muskegon,* No. 197060, slip op. at 4 (July 14, 1998). The appeals court concluded that the county did not retain the unilateral right to set limits at a very conservative level that comported neither with the companies' contractual rights to use the system nor their history of usage. The appeals court also concluded that the county was not permitted to reserve capacity for future users, because present users retained priority rights to use the system to capacity unless and until such future users were connected to the system.[3]

No municipality was party to the *S.D. Warren* decision. Neither the circuit court nor the court of appeals discussed the competing contractual interests of the local units, and neither addressed how the unilateral adoption of interference-based limits in the 1980 amendments could have expanded the contractual rights of the companies agreed to in 1973, which were subject to UCLs and discretionary grants of discharge limits in excess of the UCLs.[4]

After the United States filed the instant action, and before the court of appeals decision in the *S.D. Warren* case, nine of the local units intervened in the present action, seeking an order compelling the county to comply with federal and state regulatory requirements to implement procedures for allocation of treatment capacity consistent with the contract rights of those local units under the 1970 Access Rights Agreement, service agreements, the 1989 Allocation Contract, and grant requirements under the CWA. In their complaint, the intervening plaintiffs raised issues not raised in the *S.D. Warren* decision—specifically, the legal requirements under the CWA grant regulations to provide for reserve capacity and the contractual and common law rights of the local units, as opposed to individual third-party beneficiaries, to contract to protect system availability for their expanding communities (as provided in the Access Rights Agreement).

In December 1997, at the request of the local units, the county exercised its right under the service agreements to terminate all service agreements upon 24–months notice. That termination will become effective on January 1, 2000. The county and local units, declaring a belief that a compelling need exists to act sooner than the year 2000, have agreed to modify their earlier service agreements and replace the prior restrictions contained in Exhibit D and its amendments with the means of regulation previously attempted by the county in the form of the 1994 ordinance. *See* Attachment A to Proposed Consent Judgment; County's Brief in Support of Consent Decree, p. 41 (representing that the 1998 ordinance incorporated into the consent judgment is identical to the 1994 ordinance, with the exception only of the date and title page). The county and local units have agreed that the revised service agreement is consistent with their original contracting purpose, and that the prior agreements may violate the Clean Water Act and the NPDES permits. The proposed consent judgment also provides for county control

---

**3.** The appeals court noted, however, that "[a]ny existing parties who have paid consideration but not yet connected to the system may, for purposes of the contract, be considered present users whose needs must be accommodated when they are ready." *S.D. Warren,* slip op. at 6, n. 4. Arguably, such a construction could entitle the local units, as existing parties, to be considered present users who have contracted for specific future needs.

**4.** The county's ability under the contract to unilaterally change the discharge limits of Exhibit D also was addressed by a different circuit court judge in *Muskegon Charter Township v. County of Muskegon,* No. 90–26094–CE (August 12, 1992). *See* Movants' Ex. B. In the *Muskegon Charter*

*Township* decision, the court held that the county was within its authority under the contract to amend the regulations to eliminate further ground water discharges and that the remedy for users or contractees who objected to new regulations was review under the Administrative Procedures Act under an arbitrary and capricious standard, rather than resting in a contract claim in circuit court. Accordingly, different Michigan courts have reached different interpretations of the county's unilateral authority under the terms of the service agreements and Access Rights Agreement. As a result, the county has been subject to competing state court determinations regarding the enforceability of its 1994 ordinance, as it applies to different parties.

over discharge levels without agreements between contracting parties in the future.

## II. DISCUSSION

In order to avoid litigating the CWA and contract issues raised in the complaint of the intervening plaintiff local units, the county and local units (who were the initial contracting parties with respect to the MWWMS), have moved for entry of a consent judgment that incorporates an amended service agreement. That new service agreement clarifies the broad authority of the county to regulate discharges into the system, specifically by means of an ordinance (which, by admission of the county and local units, is identical to the 1994 ordinance rejected by the state court) rather than by amendment to discharge limits contained in the original contract. The moving parties contend that they retain the authority to enter into an amended service agreement and by so doing, they moot the interpretations placed on the old agreement by the state courts. As a result, the moving parties ask this court to accept the proposed consent judgment, to adopt the amended service agreement, and to declare void all prior service agreements, both between the local units and the county and between the service agreement companies and the county.

At oral argument on the motion, both the United States and the State of Michigan placed on the record their positions. Both affirmatively represented that they believe the proposed consent judgment is fair, reasonable and adequate.

The intervening defendant companies, however, have raised numerous challenges to the proposed consent judgment. First, the companies contend that the proposed consent judgment is manifestly unfair to the companies and not a reasonable resolution of the local contract claims. Second, the companies contend that the settlement is not in the public interest. Third, the companies assert that the proposed consent judgment improperly purports to resolve issues outside the scope of the pleadings, specifically the legality of the county's termination of the service agreements and the replacement service agreements, which purport to cut off the companies' rights. Fourth, the companies argue that the proposed consent judgment does not further the objectives of the CWA.

## A. Standard of Review

■ As all parties agree, under the Clean Water Act ("CWA"), the court must review the proposed consent judgment to determine whether it represents a resolution that is fair, reasonable and consistent with the public interest. See U.S. v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir.1986). The court also must consider whether the proposed consent judgment comes within the general scope of the pleadings and furthers the objectives of the CWA. Sierra Club., Inc. v. Electronic Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir.1990).

■ Because a consent judgment represents parties' determination to resolve a dispute without litigating the merits, the court's role is not to resolve the underlying legal claims, but only to determine whether the settlement negotiated by the parties is in fact a fair, reasonable and adequate resolution of the disputed claims. Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1126 (D.C.Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Voluntary settlement of legal disputes is favored by the courts and is generally perceived to be in the public interest. Id. The court's authority to adopt a consent decree comes from the statute which the decree is intended to enforce, but relief granted in the decree may be broader in certain respects than would be obtainable under the statute. See id. at 1125–26. See also Franks v. Kroger Co., 649 F.2d 1216, 1224 (6th Cir.1981), on reh'g, 670 F.2d 71 (1982); Vanguards of Cleveland v. City of Cleveland, 753 F.2d 479, 488 (6th Cir.1985), aff'd sub nom, Local No. 93, Intern. Ass'n of Firefighters, AFL—CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).

■ In determining whether a consent judgment is fair, reasonable and adequate, the court must not rubberstamp the agreement, but also must not substitute its own judgment for that of the parties to the decree. See United States v. Akzo Coatings of

*America, Inc.,* 949 F.2d 1409, 1435 (6th Cir. 1991) (citing *United States v. Jones & Laughlin Steel Corp.,* 804 F.2d 348 (6th Cir. 1986) (holding that a court may not modify but only approve or reject a consent decree)).

■■ While the court must consider the effect of the consent judgment on nonsettling parties, that effect is not determinative. *Id. See also City of Cleveland,* 478 U.S. at 529, 106 S.Ct. 3063. In *Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117 (D.C.Cir.1983), the court permitted an agreement to settle plaintiffs' claims under the CWA, despite the objections of intervening companies, finding the consent decree was just, fair and equitable. *See also United States v. Metropolitan St. Louis Sewer District,* 952 F.2d 1040 (8th Cir.1992) (right to intervene did not grant intervenors right to prevent settlement of the claims). "Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate." *Akzo Coatings,* 949 F.2d at 1435.

### B. Objectives of the CWA

■ As previously noted, in determining whether to enter a consent judgment, the court is required to assess the claims in dispute for the limited purpose of determining the fairness, reasonableness and adequacy of the proposed settlement. In the instant case, the intervening plaintiffs have raised a number of claims under the CWA, some of which were not previously raised against the county by any party. In order to determine the reasonableness of a proposed consent decree, the court must generally review the underlying claims and the purposes of the Clean Water Act.

The Congressional purpose behind the Clean Water Act is set forth in 33 U.S.C. § 1251. The principal stated goals of the CWA are to eliminate the discharge of pollutants into the country's navigable waters, to prohibit discharge of toxic pollutants, and to construct publicly owned waste treatment works. 33 U.S.C. § 1251(a). The CWA also recognizes and attempts to preserve the States' primary responsibilities in achieving these goals, and the role of the federal government to provide technical support and

financial assistance in meeting these goals. *See* 33 U.S.C. § 1251(b). The CWA provides a comprehensive program for controlling and abating water pollution. *Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975).

In cases initially brought by the EPA or the state to enforce rights under the CWA, any citizen may intervene as a matter of right. *See* 33 U.S.C. § 1365(b). A citizen also is permitted to bring a CWA claim in his or her own behalf. *See* 33 U.S.C. § 1365(a). The local units properly intervened in the instant action to assert their own interests under the CWA, as well as their own contracts.

In their complaint, the intervening plaintiffs challenge the adequacy of the county's industrial pretreatment program and the county's compliance with effluent standards under its NPDES permit. These claims parallel in part the claims brought by the United States and the State of Michigan. In Count II, the intervening plaintiffs also challenge the county's compliance with provisions of the CWA grants received by the county for construction and expansion of the treatment facility. Specifically, they allege that the service agreements, as interpreted by the state courts, failed to allow adequate reserve capacity as contemplated by the grant restrictions. In addition, they assert that the prior service agreements as interpreted violate the conditions under the grants requiring a system of charges that assures that all users of the system pay their proportionate share of the costs of operation and maintenance of the system, in violation of 33 U.S.C. § 1284(b). Third, they claim that the first-come/first-served method of capacity allocation violates statutory grant restrictions requiring that CWA-funded treatment systems be primarily designed to serve the municipal public needs, rather than industrial needs. These claims are distinct from the claims of the United States and from the claims raised in the *S.D. Warren* case. The moving parties contend that the proposed consent decree represents a reasonable resolution of these CWA claims, as well as the intervening plaintiffs' contractual and common law claims.

In response, the companies contend that the proposed consent judgment does not further the objectives of the CWA. Specifically, they make a number of arguments concerning the legal sufficiency of the CWA claims. First, they contend that the county and local units have provided insufficient proof that they in fact received the CWA grant funds they say they received. The companies have suggested no basis for believing the county's and local units' representations on this score are untruthful, they simply assert that the claims have not been proven. I note, however, that the county, who is being sued under the CWA, admits in the recitation of facts in the proposed consent judgment that it accepted such grants. In addition, in its answer to the intervening plaintiffs' complaint, the county admitted having received CWA grant money. No contrary evidence has been proffered.

Moreover, it is undisputed that the initial bond issue amounted to only $16 million, whereas the Access Rights Agreement specifically estimated the cost of the system at nearly $29 million and the expectation that the county would receive nearly $13 million from federal and state sources. In fact, the moving parties stipulate that actual initial cost was $40 million. Similarly, the 1989 bond issue was in the amount of $23 million, and the settling parties represent that the actual cost was twice that amount, the remainder having been paid by CWA grants. Presumably the intervening defendant companies are or should have been aware of the substantially higher total cost of the system, and in any event, those figures should be a matter of public record. Further, intervening defendants acknowledge that the agreements recite the anticipated receipt of federal and state grants. Accordingly, the companies' hypothetical challenge that CWA grants were not received is entirely too tenuous to undermine the claims of the governmental units.

Second, intervening defendant industrial users assert that under the statute, grants were not issued to construct for reserve capacity beyond 1990, and therefore the absence of reserve capacity in 1998 is irrelevant. While this argument of the companies may have some merit, it is not a necessary interpretation of the statute. It is equally possible that, while grants were not to be issued beyond 1990 for future reserve capacity, the earlier grants awarded to the county specifically reserved capacity that may or may not have been complied with. The companies' arguments, therefore, while reflecting competing views of the statute, do not render meritless count II of the intervening plaintiffs' complaint. As I previously have stated, the court's endeavor is not affirmatively to resolve the CWA claims, but instead to determine whether the settlement is a reasonable resolution of those claims. This part of the complaint is sufficiently plausible to support a settlement.

Third, the companies assert that the purpose of the CWA grant provisions is to assist in funding the construction of treatment works sufficient to meet the treatment needs of a community. They assert that the EPA was required under the regulations to determine whether the service agreements comport with the grant criteria. See 40 C.F.R. § 35.2100. Accordingly, they contend that because the EPA was required to approve the system of user charges and acceptance of industrial wastewater before the grant was approved, a later challenge to the system is somehow improper.

The court notes, however, that the regulations themselves mandate the "[t]he grantee shall maintain and operate the project to meet project performance standards including the enforceable requirements of the Act for the design life." 40 C.F.R. § 35.2214. Thus the regulations themselves contemplate continuing obligations by grantees despite the initial review requirements undertaken by the EPA. Accordingly, without affirmatively deciding the issue, I conclude that intervening defendants' objection on this basis does not substantially undermine the existence of a legitimate dispute capable of being resolved by settlement.

Finally, intervening defendants assert that because CWA regulations do not *require* that use limits be controlled by ordinance, and since they believe that Exhibit D could be further amended to comport with the requirements of the law, the adoption of an

ordinance as a means of assuring compliance does not further the Clean Water Act. I disagree. Even if not required, the use of ordinances to control discharges is an acceptable means of assuring compliance under the Act.

In sum, I conclude that the companies' statutory arguments do not seriously suggest that the proposed consent judgment is inconsistent with the purposes of the CWA. Upon review, I conclude that the intervening plaintiffs have raised plausible statutory claims under the CWA and that the proposed consent decree is consistent with statutory purposes.

### C. *Fairness and Reasonableness*

■ The companies contend that the proposed consent judgment is not a fair or reasonable resolution to the local contract claims. At issue in deciding whether to enter the proposed consent decree, however, is the fairness and reasonableness of the judgment as a resolution of the intervenor plaintiffs' CWA claims against the county. The court is not required to affirmatively decide either those claims or the intervening plaintiffs' state contract and common law claims. *See Citizens*, 718 F.2d at 1126.

The key consideration in assessing whether a decree is fair, reasonable and adequate under the statute is the public interest. *Akzo Coatings*, 949 F.2d at 1435. In assessing the fairness of a proposed consent judgment, courts generally have considered the strength of plaintiffs' case, the good faith efforts of negotiators, the opinions of counsel and the risks involved in the litigation if the settlement is not approved. *Id.* While the effect of the judgment on other parties and non-parties is a factor to be considered, the concerns of non-parties to the dispute is not determinative. *See Akzo Coatings*, 949 F.2d at 1435 (citing *United States v. Cannons Engineering Corp.*, 720 F.Supp. 1027 (D.Mass.1989), *aff'd.*, 899 F.2d 79 (1st Cir. 1990)). Other courts have allowed settlements of CWA claims over the objections of intervenors. *See id.; United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040 (8th Cir.1992). As the Supreme Court has held:

A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating. It has never been supposed that one party ... could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.

*City of Cleveland*, 478 U.S. at 528–29, 106 S.Ct. 3063.

While the court is not required to determine the fairness of the settlement as a resolution of the parties' contract claims, the court nevertheless remains obligated to evaluate the nature of the intervening defendants' objections in order to determine basic fairness of the overall agreement. Defendants have raised two types of fairness concerns with respect to their own interests: (1) prejudice to their interests in the present litigation; and (2) prejudice to their preexisting contract rights.

### 1. Prejudice to the Litigation

The companies first contend that the proposed consent judgment will prejudice their position in this litigation. However, the county and the local units propose to enter a consent judgment that would resolve only the claims raised by the intervening plaintiff municipalities. Intervening defendant companies have not filed an answer to the municipalities' complaint and have not separately brought a counterclaim against the municipalities asserting their contract claims. Instead, the intervening companies have filed only an answer to the complaint of the United States. Inasmuch as the companies have failed to take a position with respect to the claims of the municipalities against the county, the court is at a loss to determine precisely how the companies' litigation position will be affected by the resolution of those claims.

The companies suggest, however, that the sole reason for their appearance in this litigation is based on their position that the prior

service agreements were valid under the CWA. They maintain that, in order to approve the consent judgment, the court must determine that the prior service agreements were not valid under the CWA. As a result, they conclude that their position will be prejudiced.

First, as previously stated, this court's review of the proposed consent judgment is limited to determining whether the consent judgment represents a reasonable and adequate settlement of the CWA claims, not to determining the actual validity of the agreements under the CWA. *See Citizens,* 718 F.2d at 1128 (court fulfills its responsibility to determine the legality of the agreement by determining that settlement is consistent with the statute that the consent judgment is to enforce and that the proposed judgment fairly and reasonably resolves the controversy in a manner consistent with the public interest). Approval of the proposed consent judgment in no way requires a determination about the validity of the prior service agreements under the CWA.

Moreover, the companies have at no time asked this court to determine the validity of the prior service agreements under the CWA. Litigants are responsible for properly pleading their claims and defenses. In the instant case, the companies neglected to file an answer to the intervenor plaintiffs' complaint and filed no counterclaim asserting their contract rights. Were the court to accept the companies' argument that it should treat such a claim as raised, the pleading requirements and deadlines for amendment of pleadings would be rendered useless. I therefore am persuaded that the intervening defendants have failed to demonstrate harm to their position in this litigation that will be caused by adoption of the consent decree.

## 2. Prejudice to Contract Rights

The intervening defendant companies next assert that their contract rights unlawfully will be prejudiced by this proposed judgment. Admittedly, the proposed consent judgment purports to supercede all service agreements, whether between the county and municipalities or between the county and in-dividual corporate users. To the extent that the agreement proposes to supercede agreements of parties who are not signatories to the proposed consent judgment, the agreement has the potential to have an effect on contract rights.

Those contract rights, however, are not identical for each of the intervening defendant companies. The status of a particular company's claims depends on the source of its contract claims—*i.e.,* whether the company relies on its own contract or on its alleged third-party beneficiary status under the contracts between the county and the local units.

Despite this distinction between the positions of the various intervening defendants, the companies have filed a single response to the proposed judgment representing the joint position of all intervening defendants. That response neglects to distinguish claims raised by parties with separate contracts with the county from those relying upon third-party beneficiary rights under the agreements between the county and the various local units. I am unpersuaded that each of these defendants is on equal footing in light of the proposed settlement, which constitutes a renegotiation of an agreement between the original promisor and promisees to the intergovernmental contract. I therefore will discuss each type of contract claim separately.

### a. *Third-party contract rights*

The companies argue that their rights to "maximum possible use" under the prior service agreement between the county and local units cannot be cut off by a new agreement because the parties to a contract may not divest third parties of rights once they have taken legal action to enforce such rights. The companies' argument on this point, however, is based on a single unpublished Sixth Circuit opinion, *United States v. Stella,* 787 F.2d 593, 1986 WL 16614 (6th Cir.1986). The *Stella* decision itself, however, rests on a provision of the Michigan third-party beneficiary statute, Mich.Comp.L. § 600.1405(2)(c), which states:

> If the promisee is indebted or otherwise obligated to the person for whose benefit the promise was made and the promise in

question is intended when performed to discharge that debt or obligation, then the promisor and the promisee may, by mutual agreement, divest said person of his rights, if this is done without intent to hinder, delay or defraud said person in the collection or enforcement of the said debt or other obligation which the promisee owes him and before he has taken any legal steps to enforce said promise made for his benefit.

As is apparent from the quoted language, however, the referenced provision addresses only situations in which the promise for the benefit of the third party was made to discharge a preexisting debt or obligation owed by the promisee to the third-party beneficiary. The companies have not argued that the municipalities made their service agreements with the county for the benefit of the companies in order to discharge a preexisting debt owed by the municipalities to the companies. The statutory provision and the case, therefore, are inapplicable here.

The companies have made no general argument that their third-party beneficiary rights have irrevocably vested under the other provisions of § 600.1405, such as subdivision (2)(a), which provides that third-party beneficiary rights vest at the time of the promise "subject always to such express or implied conditions, limitations, or infirmities of the contract to which the rights of the promisee or the promise are subject." Apparently, the companies' implicit recognition is that the contract at issue expressly contemplated future changes and fixed no permanent discharge limits, and further that the contract was terminable by either party. Despite the companies' lack of specific objections on this point, however, and in light of the posture of this case, I will discuss in some detail why I conclude that these contractual limitations allow the original contracting parties to amend or rescind their prior agreements without interfering with vested third-party rights.

First, I note that the original global service agreements contained discharge limits, which were set forth in Exhibit D. That exhibit itself contained the right for the county to amend or repeal the regulations contained in Exhibit D, as long as those changes were necessary to the proper functioning of the system or to achieve equity among users, and as long as those regulations or amendments were not more stringent than those required by state or federal agencies. Def. Ex. D: Service agreement, ¶ 8. The service agreements also provided that the agreements themselves were terminable upon two years notice. Service Agreement, ¶ 12. An addendum to the service agreements provides a detailed mechanism for reassessment of fees associated with use and changes in use caused by amendments to Exhibit D. Section X of Exhibit D also provided procedures for the amendment or repeal of the regulations contained in Exhibit D. Accordingly, the service agreements contemplated changes in the amounts of discharges and provided no vested interest in fixed amounts of discharges to the system. The proposed revised changes to the agreement, therefore, do not alter fixed, particularized expectations, only contingent expectations.

Second, the agreements contemplated termination of the contracts by either side. Admittedly, the termination clause does not control this renegotiation between the original contracting parties because the amended service agreement contemplates immediate termination of the original service agreements, rather than January 1, 2000, when the notice of termination previously issued by the county will become effective. However, the existence of a valid termination clause undermines the companies' arguments that their rights under the original agreements were vested and subject to no reservation by the original contracting parties to change their agreement. *Cf. United States v. Wood,* 877 F.2d 453, 458 (6th Cir.1989) (under Kentucky law, when right to alter, amend or rescind contract is specifically provided or reserved therein, it may be rescinded without liability to a third-party beneficiary).

■ The companies argue, however, that under the present circumstances, the county and municipalities do not have the authority to terminate the service agreements, and implicitly, therefore, no right to renegotiate their prior agreements. The companies assert that the termination clause of the agree-

ment may only be exercised in good faith. For this proposition, the companies cite the case of *J.R. Watkins Co. v. Rich*, 254 Mich. 82, 235 N.W. 845 (1931). Although the *J.R. Watkins* decision contains some language suggesting that contract terminations must always be exercised in good faith, subsequent Michigan courts have held that the *J.R. Watkins* court's requirement of good faith applies only to circumstances in which the party exercising the termination clause has control over the other party's performance under the agreement and where the triggering event for the termination clause is the other party's failure to perform. *See Eastway & Blevins Agency v. Citizens Ins. Co. of America*, 206 Mich.App. 299, 520 N.W.2d 640 (1994) (citing *J.R. Watkins*, 254 Mich. 82, 235 N.W. 845). Here, unlike in *J.R. Watkins*, the county is not in sole control of the defendant companies' compliance with the agreement terms, nor is the termination clause triggered by some failure to perform by intervening defendants. Instead, the termination clause was limited by a variety of other terms undisputedly met in this case: (1) the completion of all bond payments; (2) the termination with all contractees simultaneously; and (3) the provision of 24–months' notice. Where the termination clause is properly limited by constraints outside the sole control of the party exercising the clause, no good faith is required. *Eastway*, 206 Mich.App. at 303, 520 N.W.2d 640.

█ Moreover, other courts have concluded that the *J.R. Watkins* decision actually was based on a finding that the party exercising the clause had failed to negotiate for the clause in good faith. *See Cloverdale v. Simon Aerials, Inc.*, 869 F.2d 934, 938 (6th Cir.1989). Where the parties have negotiated a termination clause in good faith, proof of good faith is not necessary to the exercise of that clause. *See Cloverdale*, 869 F.2d at 938; *Eastway*, 206 Mich.App. at 303, 520 N.W.2d 640. A lack of good faith may not override an express provision in the contract. *See id.; General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (6th Cir.1990). The

companies have not alleged bad faith in the negotiation of the term, nor could they plausibly do so in circumstances in which the clause was not exercised until some twenty-five years after the contract was negotiated.[5]

Even were good faith required, however, defendant companies have suggested no reason why this court should conclude that the county's and local units' desire to renegotiate terms of their own contract in a way that is less favorable to the companies and more favorable to other users would be bad faith. Even if the industrial users believe that the capacity of the system would allow the county to continue to accept additional industrial waste, it cannot be bad faith for the county and the municipalities to take a different view of the system's capacity for purposes of renegotiation. *J.R. Watkins* addressed a situation in which the termination clause was triggered by the other party's failure to perform under the contract. Good faith was required because the terminating party had control over the other party's performance. Where no such interdependence between triggering event and termination exists, I find no authority for concluding that it is bad faith for a party to limit the period of its exposure to an unsatisfactory interpretation of its agreement by exercising a bargained-for right provided in that agreement.

In fact, in all likelihood, the potential for disputes in contract interpretation was precisely what led the parties to agree to the negotiated term. If the county has to live with the state court interpretation of the agreement, presumably it may only be required to do so for two years beyond the time of notice to all parties of its intent to terminate the agreement.

Taken together, both the reservation of rights to change Exhibit D regulations and the inclusion of a termination clause in the agreement prevent any third-party rights from being irrevocable.

█ Moreover, despite the implicit conclusion of the Muskegon Circuit Court in the

5. Also pending at this time is a motion by the county for protective order from discovery requests by intervening defendants going to the county's good faith in terminating the service

agreements. In light of my conclusions concerning good faith, the motion for protective order is granted.

*S.D. Warren* decision, under third-party beneficiary principles, the public does not ordinarily take third-party rights in public contracts. *See Price v. Pierce,* 823 F.2d 1114 (7th Cir.1987) (holding that applicants for subsidized housing as against the housing developers and IHDA, an agent for HUD, were not mere incidental beneficiaries to contracts to develop low income housing, but they were not entitled to status as parties to the contract because such status would result in untenable position of preventing the government from negotiating unless it received a release from all of the applicants for public housing), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). Moreover, even if the companies may be considered to have third-party beneficiary rights to enforce the contract against the county, they have no such rights against the local units. *See* 56 Am.Jur.2d Municipal Corporations § 500 (1971) ("[A] citizen has no vested right in a contract between the municipality in which he resides and a third person, and even if he may sue on the contract while it is in force he cannot prevent the municipality from modifying it or abrogating the contract so that he will no longer enjoy the benefit of it."). The status of the companies cannot be viewed to impose a requirement whereby the municipalities must get the consent of each of their users in order to consent to a new agreement with the county. *See also* Samuel Williston & Walter Jaeger, *Williston on Contracts,* § 372A (3d ed. 1959 & Supp.1998) (noting that a public member has no *contractual* right to sue a public service provider, such as a streetcar carrier, because "[i]f the right were contractual, the right of fare could not be raised without the consent of everyone who rode on the streetcars, and the city would have no legal right to consent to modify the terms of the agreement. The rights of the public do not preclude the public service corporation from adjusting rate controversies with the municipality.")

The companies next argue that the service agreement, which the proposed consent judgment purports to amend, is not the only agreement under which they have rights vis-a-vis the county. Specifically, the companies allege third-party contractual rights under the Access Rights Agreement between the county and the municipalities. The companies acknowledge that this agreement was not signed by the companies, but they allege third party beneficiary rights under that agreement and rights by way of incorporation of those agreements into supplemental municipal agreements between the local units and various companies.[6]

No industry is a signatory to the Access Rights Agreement and no state court has held that the companies have third-party beneficiary rights under the Access Rights Agreement. Further, the only language of the Access Rights Agreement arguably relied upon by the industries is the language of "maximum possible service" that was incorporated into the individual service agreements and which the court already has discussed.. To the extent such rights may have existed vis-a-vis a unilateral change by the county, the county and municipalities retain their rights to modify or terminate their own contract by mutual agreement, as I already have held. Moreover, the county and municipalities have not amended the Access Rights Agreement. Instead, they have merely agreed upon an understanding of that agreement.

I therefore conclude that the intervening defendant companies have no status as third-party beneficiaries of the prior agreements between the county and the municipalities to prevent renegotiation of those contracts by the original contracting parties. I further conclude that the companies relying on their status as third-party beneficiaries present no valid reason to block the proposed consent judgment.

**6.** The companies broadly allege these claims, but do not provide copies of these municipal agreements between all companies and the relevant municipalities. Egelston Township, an added plaintiff in this action, specifically disputes the companies' contention. At least with respect to the agreements between Egleston Township and Lomac, Inc. (and its predecessor Lakeway Chem-ical Corp.) and between Egleston Township and Sun Chemical, Inc., the municipal access agreements do not incorporate the access rights agreement between the county and municipalities. Egleston Township has attached the agreements and defendants have not disputed the township's proofs.

### b. *Individual contract rights*

With respect to those companies with separate contracts with the county, I acknowledge that the *S.D. Warren* decision appears to interpret the companies' individual contract rights vis-a-vis the county to include the right to discharge to the maximum extent possible, up to the level of interference. I conclude, however, that these "rights" do not bar entry of the proposed consent judgment.

First, although I need not affirmatively determine whether the *S.D. Warren* decision was correctly decided, I question the rationale of the decision in the context of this litigation. Specifically, I question how the companies may be said to have obtained individual *contractual* rights to discharge up to the level of interference. The contracts signed by the companies in approximately 1973 contained no references to the level of interference. Instead, the county set limits in the original Exhibit D that restricted discharge percentages, with discretionary authority in the county to allow users to exceed those limits. While the later amendments to Exhibit D became binding on the companies under the reservation clause of Exhibit D, which permitted the county to change the regulations in Exhibit D, the amendments themselves reserved the county's ability to change the regulations further. Therefore, any *increase* in benefit to the companies based on the amendments was not bargained for at the time of their acceptance of the service agreements. Accordingly, the doctrine of interference did not amount to a bargained-for term that the companies should be entitled to enforce. Further, any reliance by the companies upon an expectation that the interference doctrine would be perpetually preserved would be unreasonable in light of the specific reservation in both the original Exhibit D and the amendments to Exhibit D that allowed the county to change the regulations.

Based on this analysis, I question whether the Michigan Supreme Court would uphold the contractual analysis reached by the Muskegon Circuit Court and the Michigan Court of Appeals. In addition, I question whether either the circuit court or the court of appeals, if faced with the present stipulated change in the master service agreement between all the governmental units would have reached the same decision.

For purposes of approving or rejecting the present consent judgment, however, I am not faced with deciding the correctness of the *S.D. Warren* decision. Instead, I must ask whether the contract rights of the five companies who signed direct contracts with the county may prevent the adoption of the present consent judgment affecting the rights of all of the governmental units and each of their many users. I conclude that they may not.

As I previously have analyzed, nothing about the contract rights of these companies would impair the ability of the county and local units to enter into an agreement affecting all other parties and all other users of the system. As a result, the sole objectionable principle in the consent judgment is contained in the second sentence of paragraph D.2., which states:

> The Amended Service Agreement is to have immediate and superseding force and effect over all previously executed Service Agreements, whether between the County and Local Units, *or between the County and Service Agreement Industries.*

(emphasis added). In other words, the sole question is whether the agreement must be barred because it purports to consensually supersede a contract, where one of the contracting parties (the particular service industry) has not agreed to the change.

I conclude that the provision at issue does not bar acceptance of the proposed consent judgment. First, in light of the fact that the county has properly terminated all prior service agreements effective January 1, 2000, the only contractual interest held by the industries with individual agreements is for rights during the next year. Accordingly, the companies' argument to the state courts that the ordinance improperly replaced vested rights to discharge up to the level of interference with a discretionary right exclusively controlled by the county has only limited force. The short duration of any remaining contractual rights renders the discretionary impairment very small.

Moreover, the adoption of the ordinance does not, standing alone, demonstrate that the companies with individual contracts will actually experience a reduction in the amount of discharges they will be allowed. The companies themselves, while arguing generally that all twelve companies will have some "entitlements" altered, have not asserted that the industries with individual service agreements will be adversely affected during the next year. In fact, if each individual user has a right to maximum use, any other user in the system could find its ability to discharge restricted, even under the existing regulations. As a result, no particular user can demonstrate a reduction in discharges during the coming year under the ordinance in the proposed consent judgment. In fact, no intervening defendant has attempted to make such a showing. In addition, while the ordinance has the potential to limit the ability of some industrial users to expand during the next year, it is unclear whether any one of the five companies with individual contracts actually intended to so expand during that period. Thus, no clear harm to contract rights is apparent from the companies' representations. *See Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012 (4th Cir.1993) (requiring parties alleging constitutional impairment of contract rights to prove actual, substantial impairment resulting from impermissible exercise of government power) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)), *cert. denied*, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994).

More significantly, however, I conclude that the companies' existing individual contracts—as already interpreted by the Michigan Court of Appeals—would subject those companies to the terms of the new ordinance, even if the previously quoted term from paragraph D.2. were not included in the agreement. The court of appeals in the *S.D. Warren* decision specifically held that the companies' contractual right to use the system was limited to "reasonable access to available capacity." *S.D. Warren*, slip op. at 4. The court reasoned that contractual rights to maximum use ran concurrent with the contractual requirements that "all uses of the

system 'must be consistent with "the preservation of public health and safety, the fulfillment of obligations under federal and state law, the successful functioning of the system, and *fairness to all parties*." ' " *Id.* (quoting circuit court opinion quoting contract) (emphasis added).

As a result, by the state court's interpretation of the prior service agreements, the companies' rights to discharge into the system may appropriately be limited by the county based on considerations of fairness to all present users. I have previously concluded that the service agreement between the county and local units, which affects the rights of all users except the five individually contracting companies, may be modified by the consent of the original contracting parties. If all other users to the system will be bound by the new ordinance, the contract terms of the original Exhibit D requiring fairness to other users of the system will allow the county to equitably limit the use rights held by the five individual companies who signed individual contracts.

Accordingly, I am unable to identify a cognizable contractual impairment under paragraph D.2. that should prevent entry of the consent judgment.

### D. *Frustrate State Court Judgments*

The industrial users next argue that the consent judgment would improperly frustrate state court judgments. However, the state courts rendered decisions on the original contracts that presumed no change in the agreement between the contracting governmental units. Unless as third party beneficiaries the companies have vested rights in the old contract that are beyond the ability of the municipalities to renegotiate, nothing about accepting the new contract would interfere with the state court judgments. In light of my conclusions about the ability of the county and municipalities to terminate or renegotiate their agreements, the Amended Service Agreement will not frustrate state court judgments.

### E. *Public Interest*

The industrial users also contend that the proposed judgment is not in the public inter-

est. They suggest that if their contractual rights are abolished, the companies will be released from paying any additional debt service on the expansion bonds. If they default, they argue, the public will be subjected to substantial expense, which would not be in the public interest.

The persuasiveness of this argument, however, turns in part on whether the companies have any basis for defaulting on the bonds based on the Amended Service Agreement, as it is applied to them. They have never been assured that all of their discharges would be accepted, and they cannot show that they will experience any actual decrease in the amount of use in the near future.

In addition, the service agreements provide for reductions in the amount of payments in proportion to the volume of materials not accepted by the system. *See* Service Agreements, ¶ 10. Further, Exhibit D to the service agreements provides that if changes in the regulations under amendments to Exhibit D have the effect of barring any portion of the waste materials of the contractee, the guarantee of such contractee will be proportionately reduced. Thus, it is not clear on what basis they would default on their payments.

In any event, however, the mere possibility that the Amended Service Agreement could induce one or more service agreement industry to decide to terminate its bond obligations is insufficient reason to reject the instant settlement. Nothing requires the court to reject the actual settlement of presently pleaded claims simply because some small potential exists for future litigation over separate obligations. In contrast, the proposed consent judgment unquestionably disposes of significant active claims between the parties that are the subject of this litigation.

The agreements appear to serve the public interest in resolving disputes, as well as the goals of the CWA. I therefore conclude that the agreement is in the public interest.

### F. *Matters Outside the Pleadings*

The industries next argue that the consent judgment improperly resolves issues outside the scope of the pleadings. By this, the companies apparently mean that the court will be required to resolve the legality of the county's termination of the original service agreements, the legality of the immediate termination of the agreements (rather than after two years of notice), and the legality of replacement service agreements. These issues, however, go to whether the municipalities have authority to renegotiate their contracts in the face of arguable third-party rights and the fairness of allowing that settlement. If they have authority to renegotiate the contracts, however, the contract rights that were originally part of the dispute are mooted. In addition, the companies have suggested no basis for believing the new contracts are illegal, save the question of whether the companies had vested rights in the prior agreements. The parties' contractual objections have been addressed earlier in this opinion.

Finally, as the local units observe, while the court must consider the effect of the consent judgment on nonsettling parties, that effect is not determinative. *See Akzo Coatings*, 949 F.2d at 1435. *See also Citizens*, 718 F.2d 1117 (permitting an agreement to settle plaintiffs' claims under the CWA, despite the objections of intervening companies, finding the consent decree was just, fair and equitable); *United States v. Metropolitan St. Louis Sewer District*, 952 F.2d 1040 (8th Cir.1992) (right to intervene did not grant intervenors right to prevent settlement of the claims).

### III. *CONCLUSION*

For the foregoing reasons, I conclude that the proposed consent judgment is a permissible settlement of the action between the county and intervening local units. Accordingly, the joint motion of the county and intervenor plaintiffs for entry of consent judgment (docket # 70) is **GRANTED**. The county may legally sign the consent judgment to which it has agreed. The proposed consent judgment will be signed and entered as an order of the court upon receipt of the county's signature page.

### ORDER

In accordance with the opinion filed this date,

**IT IS ORDERED** that the joint motion of the county and the intervenor plaintiffs for entry of consent judgment (docket # 70) is **GRANTED.**

**IT IS FURTHER ORDERED** that the county may legally sign the consent judgment to which it has agreed. The proposed consent judgment will be signed and entered as an order of the court upon receipt of the county's signature page.

**IT IS FURTHER ORDERED** that the county's motion to limit discovery (docket # 92) is **GRANTED.**